**INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, et al., Appellants (Defendants),**

v.

**WALGREEN CO., et al., Appellees (Plaintiffs).**

No. 49S00–0112–CV–647.

Supreme Court of Indiana.

May 28, 2002.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellants.

Michael B. McMains, Matthew W. Foster, McMains Foster & Morse, P.C., Indianapolis, IN, Attorneys for Appellees.

J. Michael Grubbs, Thomas F. Shea, Jody L. Deford, Barnes & Thornburg, Indianapolis, IN, Attorneys for Amici Curiae AmHealth (Evansville), Inc., et al.

SHEPARD, Chief Justice.

Common wisdom holds that the most complicated matter in state government is the school funding formula. This case about Medicaid administration places that in doubt.

Faced with a sizeable projected financial shortfall, Indiana's Medicaid administrators adopted both emergency and permanent rules to pay pharmacies a dollar less per prescription dispensed and reduce their drug reimbursement rate by three percent. These measures would save the State $825,000 per month.

A group of retail drug companies, pharmacy trade associations, and individual Medicaid recipients (collectively "Walgreens") obtained a preliminary injunction preventing these rules from taking effect. For reasons explained below, we reverse the order granting the preliminary injunction.

### Facts and Procedural History

The Indiana Family and Social Services Administration and its subdivision, the Office of Medicaid Policy and Planning (collectively "FSSA"), administer Indiana's Medicaid program. In December 2000, the director of that office, Kathleen Gifford, reviewed the forecasts of Medicaid spending for fiscal year 2002 [1] and concluded that appropriations would not cover program expenditures. Gifford ultimately projected the fiscal 2002 Medicaid deficit at over a hundred million dollars.

To address this shortfall, Gifford explored various cost containment measures. Among other things, she recommended reducing the drug dispensing fee from four dollars to two dollars and decreasing the

---

1. July 1, 2002, through June 30, 2003.

pharmacy reimbursement rate from ninety to eighty-seven percent of the average wholesale price (AWP).[2]

On April 1, 2001, FSSA published a proposed permanent rule reflecting these reductions, and on April 23rd it conducted a public hearing. Based upon the hearing and input provided by "members of the pharmacy community," FSSA revised the proposed rule to reflect a three dollar dispensing fee.

The Attorney General's office received the final rule on July 10, 2001, and approved it on August 24th. Governor Frank O'Bannon signed the rule on August 28th, and the Secretary of State's office accepted it for filing on August 29th, with a designated effective date of September 28, 2001.

While the permanent rule was still in the pipeline, FSSA adopted an emergency rule "to put the cost containment measures in as soon as possible because of the fiscal crisis." (T.R. at 56.) On August 20, 2001, State Budget Director Betty Cockrum exercised recently-enacted statutory authority and directed FSSA to adopt emergency rules to limit Medicaid expenditures to the amount of the legislative appropriation. See P.L. 291–2001 § 48. FSSA officials signed an emergency rule that was substantively identical to the permanent rule, and notified Medicaid providers that the new rates would become effective on August 27, 2001.

Walgreens obtained a temporary restraining order to delay implementation of the emergency rule and sought an injunction against implementation of both rules. Following a hearing, the trial court granted the preliminary injunction on October 9th.

We accepted jurisdiction over the ensuing appeal without prior consideration by the Court of Appeals, to expedite a resolution. See Ind. Appellate Rule 56(A).

## I. The "Per Se" Injunction Standard

▮▮▮ The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion. *Harvest Ins. Agency, Inc. v. Inter–Ocean Ins. Co.,* 492 N.E.2d 686, 688 (Ind.1986).

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence the following:

1) [movant's] remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action; 2) it had at least a reasonable likelihood of success at trial by establishing a *prima facie* case; 3) its threatened injury outweighed the potential harm to appellant resulting from the granting of an injunction; and 4) the public interest would not be disserved.

*Id.* (citations omitted); *T.H. Landfill Co., Inc. v. Miami County Solid Waste Dist.,* 628 N.E.2d 1237, 1238 (Ind.Ct.App.1994). If the movant fails to prove any of these requirements, the trial court's grant of an injunction is an abuse of discretion. *Boatwright v. Celebration Fireworks, Inc.,* 677 N.E.2d 1094, 1096 (Ind.Ct.App.1997).

The trial court held that FSSA violated several procedural requirements in adopting the permanent and emergency rules. Having found statutory violations that demonstrated a likelihood of success, the court relied on a "per se" rule under which

---

**2.** Gifford developed these recommendations after comparing Indiana's Medicaid rates to private sector rates using research from an actuarial consulting firm, information from health maintenance organizations under contract to the state, rates for the state employee health insurance plan, and a newsletter from a pharmacy network. (T.R. at 30.)

the other elements of the standard injunction analysis were presumed.

■ This Court has indicated that a relaxed standard may sometimes be applied for clear, uncontested unlawful conduct. *Schrenker v. Clifford,* 270 Ind. 525, 529, 387 N.E.2d 59, 61 (1979). But because parties are relieved of several showings usually necessary to obtain injunctive relief, this relaxed standard "is only proper when it is clear that [a] statute has been violated." *Union Township Sch. Corp. v. State ex rel. Joyce,* 706 N.E.2d 183, 192 (Ind.Ct.App.1998).

In prior Indiana decisions employing the relaxed standard, the "per se" rule has been used to enjoin activity that is clearly unlawful and against the public interest, such as the practice of medicine without a license.[3] The "per se" rule has never been used to permit a private party to enjoin State action based on an alleged procedural deficiency in promulgating rules. A private assertion of public interest will rarely justify enjoining State conduct when it is based only on a procedural challenge and a *prima facie* case.

Here, there is no question that FSSA has legal authority to revise Medicaid dispensing fees and reimbursement rates. The question is whether it went about the task appropriately. The rules at issue may or may not have been properly promulgated (as we discuss further below), but the action itself is one the statute allows.

Absolving Walgreens from proving irreparable injury and a balance of harm in its favor was error. We therefore proceed to review the standard proofs necessary for obtaining injunctive relief.

## II. Irreparable Harm and Balance of Harms

■ As noted above, a plaintiff must prove four things to justify a preliminary injunction, which we caption as (1) irreparable harm, (2) likelihood of success on the merits, (3) balance of harms, and (4) public interest. We will proceed to consider each factor.

■ Walgreens' initial burden was to demonstrate that "remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action." *Tilley,* 725 N.E.2d at 153–54 (citations omitted). If an adequate remedy at law exists, injunctive relief should not be granted. A party suffering mere economic injury is not entitled to injunctive relief because damages are sufficient to make the party whole. *Xantech Corp. v. Ramco Indus., Inc.,* 643 N.E.2d 918, 921–22 (Ind. Ct.App.1994).[4]

---

3. We take no position on whether these cases correctly applied our holding, but note only the Court of Appeals has occasionally invoked the "per se" standard when faced with clearly unlawful conduct. *See, e.g., Union Township Sch. Corp.,* 706 N.E.2d at 192 (defendants violated construction wage statute); *L.E. Servs., Inc. v. State Lottery Comm'n,* 646 N.E.2d 334, 338, 349 (Ind.Ct.App.1995) (company's plan to provide mail order service for out-of-state lottery tickets violated anti-gambling statutes); *Kaminsky v. Med. Licensing Bd.,* 511 N.E.2d 492, 498 (Ind.Ct.App.1987) (injunction based on unauthorized practice of medicine); *State ex rel. Med. Licensing Bd. v. Stetina,* 477 N.E.2d 322, 327 (Ind.Ct.App. 1985) (denial of injunction for a clear viola-

tion of unauthorized practice of medicine statute was error); *State ex rel. Dept. of Natural Resources v. Mason,* 416 N.E.2d 1312, 1315–16 (Ind.Ct.App.1981) (enjoining improper construction of boat channel that substantially departed from permit's scope); *De-Mayo v. State ex rel. Dep't of Natural Res.,* 182 Ind.App. 241, 244–45, 394 N.E.2d 258, 260–61 (1979) (upholding injunction when property owner encroached on shoreline without a valid permit).

4. The great weight of authority holds that merely economic injury does not warrant injunctive relief because post-trial damages can adequately compensate the injured party.

The crux of Walgreens' argument is that a reduction in dispensing fees and reimbursement rates will cause a handful of pharmacies to close. Plaintiff Ralph Anderson testified that he owns two Bedford pharmacies: a retail pharmacy that offers prescription home delivery, among other services, and an institutional pharmacy that does not conduct business directly with the public. Anderson said the institutional pharmacy would likely close and speculated that the other might as well.[5] (T.R. at 212, 227–28.)

Also, a CVS spokesman testified that "some" of the 268 CVS pharmacies located in Indiana "will ultimately have to be closed" as a result of the Medicaid cuts. (T.R. at 254, 256, 259.) He cited only three definite instances, and further testified that closing stores was part of the ordinary course of business and that customers of the closed stores always find alternative providers. (T.R. at 259, 267–68, 270–72, 277.)

Walgreens failed to identify any injury beyond purely economic injury, which is not enough to justify injunctive relief. We conclude that post-trial damages would adequately compensate for any injuries should Walgreens prevail at trial. Moreover, the potential harm from the estimated one hundred million dollar State Medicaid deficit outweighs Walgreens' potential injury.

## III. Likelihood of Success on the Merits

Walgreens claims that the emergency and permanent rules violated a number of statutory procedural requirements. Rather than focusing on whether Walgreens was likely to prevail on each claim, the trial court flatly held that FSSA violated each cited statute. We therefore review each of these conclusions for clear error.

### A. Statutory Authority for the Emergency Rule

■ During its 2001 session, the General Assembly gave the state budget director

---

See, e.g., *Ind. Family & Social Servs. Admin. v. Legacy Healthcare, Inc.*, 756 N.E.2d 567, 571–72 (Ind.Ct.App.2001); *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 692 N.E.2d 905, 909 (Ind.Ct.App. 1998); *Xantech Corp.*, 643 N.E.2d at 921; *Ind. State Dept. of Welfare, Medicaid Div. v. Stagner*, 410 N.E.2d 1348, 1352–53 (Ind.Ct. App.1980) (citation omitted). Imminent business loss or failure is a form of economic injury. We find the reasoning of *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958), persuasive:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

5. Walgreens also presented the trial court with the affidavits of six Medicaid beneficiaries who testified that they would be harmed

if the cost cuts go into effect. The one affidavit presented in the record for our review is from Inez Rodman, who receives home delivery of her prescriptions by Ralph Anderson's pharmacy. (Appellees' App. at 436.) Rodman stated that she and others in Bedford would be "hurt if [Anderson's retail pharmacy] went out of business." (*Id.* at 436–37.)

This showing does not meet Walgreens' burden in demonstrating irreparable harm. First, Anderson testified that the home delivery service was not required by Medicaid and was provided as a "community service." (T.R. at 216.) Second, Anderson did not testify that either his retail pharmacy would close or that the home delivery service would terminate. (T.R. at 227–28.) Third, Bedford has at least four other pharmacies. (T.R. at 231.) Finally, Director Gifford testified that the State, through the FSSA staff and help line, would "do whatever we needed to do to ensure [Medicaid beneficiaries] had sufficient access." (T.R. at 114–16.)

broad authority, effective July 1, 2001, to cut Medicaid expenditures to match appropriated funds:

> *Notwithstanding ... any other law,* or any rule, if the budget director makes a determination at any time during either fiscal year of the biennium that Medicaid expenditures to date are at a level that may cause total expenditures for the year to exceed total Medicaid appropriations for the year, the budget director may, after review by the budget committee, direct the secretary to adopt emergency rules to the Medicaid program to decrease expenditures that have risen significantly to limit Medicaid expenditures to the Medicaid appropriations in this act. Adjustments under this subsection may not:
>
> (1) violate a provision of federal law; or
>
> (2) jeopardize the state's share of federal financial participation; applicable to the state appropriations contained in the biennial budget for Medicaid assistance and Medicaid administration.

P.L. 291–2001 § 48 (emphasis added).[6]

The legislature explicitly provided that this statute would supplant all others.

Therefore, if the statute's provisions were met, the emergency rule is valid.

Walgreens argues that FSSA did not satisfy the statute's requirement of review by the budget committee, so the emergency rule is invalid. Director Gifford testified that in June 2001 she presented the budget committee with a summary of all pending cost containment rules and advised them of the likelihood of emergency action. (T.R. at 62.) Gifford said the committee members "listened to my information and asked questions" and that there was "discussion about—among the members of the budget committee about the [dispensing fee and reimbursement rate] reductions."[7] (T.R. at 68, 104.) Gifford also gave budget committee members a handout summarizing the status of Medicaid cost containment proposals. (T.R. at 104, Def. Exh. A.)

Walgreens offered testimony by two budget committee members, Senators Vi Simpson and Robert Meeks. Senator Simpson testified that only formal agenda items are "reviewed" by the committee and that "if we don't want to review something, we just don't put it on the agenda."[8]

---

**6.** Indiana Code Ann. § 4–22–2–37.1(a)(20) (West 2001) already provided an expedited mechanism for emergency FSSA rules. Public Law 291–2001 § 48 further streamlined this process.

**7.** Gifford further testified: "I made it very clear that I understood my instructions to be to implement these as quickly as possible and to move forward because I believe it was Senator Simpson who was urging us to hold off on these cuts. And I told her that my instructions were not to do so and to move forward as quickly as possible." (T.R. at 106.)

**8.** Senator Simpson preceded this statement by explaining,

> [R]eview has, for the purposes of the Budget Committee, ... a very specific connota-

tion.... And when we do a review, with that connotation, it is listed as a review item on the agenda, and the action of the Budget Committee ... is ... an explanation ... and/or discussion of that particular item. That is like our approval of that particular item. We don't actually vote on it. The review is all that's required.

(T.R. at 186.) She went on to say:

> Remember[ ] that the majority members of the Budget Committee—in this case the three Democrats on the Budget Committee—set the agenda, and we ... discuss every agenda item prior to it showing up on the agenda. So it is very much an intentional selection of items that are put on the agenda.

(T.R. at 188.)

Senator Meeks echoed this view, saying, "There was a report but no review. If there had been a review, it would have been an

(T.R. at 186.) Senator Simpson acknowledged that the committee discussed the proposed AWP reimbursement and dispensing fee cuts. (T.R. at 188.)

The words of the statute do not bear out Walgreens' argument that FSSA can act only after the budget committee lists its proposals for review as a separate item on the agenda. Public Law 291–2001 § 48 assures budget committee members advance notice of agency actions and creates an opportunity for the members to participate in the deliberations. It does not, however, condition FSSA's authority to act on approval by the committee, as certain other statutes do.[9]

Here, Gifford told the committee about the specifics and urgency of these anticipated measures, and committee members had an opportunity to express their views. This appears to comply with the straightforward language of the statute.[10]

We conclude that P.L. 291–2001 § 48 authorized the procedure followed in adopting the emergency rule, and that budget committee review was sufficient. The trial court's findings and conclusions to the contrary were therefore clearly erroneous. Based on this conclusion, we need not address Walgreens' other statutory challenges to the emergency rule.

■ To expedite resolution of this dispute, we address one practical consideration that neither party has raised: how long an emergency rule under P.L. 291–2001 § 48 may remain in effect. Section 48 is silent on this point, so we rely on the time frame in the general statute on emergency rules, Ind.Code Ann. § 4–22–2–37.1(g) (West 2001). Under this statute, emergency rules may generally remain in effect for ninety days after they are accepted for filing and may be extended by re-adoption for one additional ninety-day period. *Id.* Here, the clock will begin to run when the temporary injunction is lifted and the emergency rule goes into effect.

**B. Challenges to the Permanent Rule**

Walgreens claims that the permanent rule violated several procedural statutes. We will address each in turn.

■ *1. The Survey Statutes.* Walgreens bases part of its challenge on Ind. Code Ann. §§ 12–15–31–1 through 4 (West 2001), which said:

(defining review as "[c]onsideration, inspection, or reexamination," not approval).

---

item on the agenda. It was not.... What we got was a report on the status of where they were and where they were expected to go." (T.R. at 243–44.) He went on to say, "[T]hey were talking about where the shortfalls were and some necessary plans that they were going to try to put in place to remedy that shortfall." (T.R. at 245.)

**9.** *See, e.g.,* Ind.Code Ann. § 11–13–2–1 (West 2001) (requiring budget committee approval before Indiana's judicial conference may distribute state financial aid for court probation services); Ind.Code Ann. § 12–8–1–12(a) (requiring unanimous budget committee recommendation prior to appropriation of additional Medicaid funds to supplement the legislative appropriation, when necessary to avoid violating federal law or jeopardizing federal Medicaid funding). *See also* Black's Law Dictionary 1320 (7th ed.1999)

**10.** Amici curiae argue that the statute requires budget committee review within the affected fiscal year (in this case, after July 1, 2001), after the budget director has reviewed fiscal year-to-date expenditures and identified a problem. (Amicus Br. at 7–8.) We find this too narrow a construction. The statute only requires that the committee review occur before the budget director directs the Secretary of FSSA to adopt emergency rules, which was the case here. *See* P.L. 291–2001 § 48. In her August 20, 2001 letter, Budget Director Cockrum stated that she had determined, as the statute requires, "that Medicaid expenditures are at a level that may cause total expenditures for the year to exceed total Medicaid appropriations for the year." *See id.;* (Def.Exh.B.)

Sec. 1. Not later than October 1 of each year, the office [of Medicaid Policy and Planning] shall conduct a survey of pharmacy providers to assess the appropriate level of dispensing fees to be paid to providers for prescribed drugs.

Sec. 2. A survey under section 1 of this chapter must include an evaluation of dispensing fees in other states and the policies of the federal Health Care Financing Administration (HCFA).

Sec. 3. A dispensing fee shall be evaluated based upon the following information concerning the costs of pharmacy operation:

(1) Operational data.

(2) Professional services data.

(3) Overhead data.

(4) Profit data.

Sec. 4. If an adjustment is made following a survey conducted under section 1 of this chapter, the secretary shall commence the rulemaking process under IC 4–22–2 to make the adjustment not later than November 1 of the year in which the survey was conducted.

The General Assembly repealed this statute, effective approximately April 29, 2001. *See* P.L. 291–2001 § 211. This was after the proposed rule was published and the public hearing held, but before the rule was finalized and submitted to the Attorney General.

The trial court held that FSSA's failure to conduct a survey violated the statute because the repeal was effective only prospectively. The court reasoned that the repeal "did not release Defendants' previously incurred obligation to conduct the dispensing fee survey" because the requirement "remain[ed] in force" under Ind.Code § 1–1–5–1, which says "repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or *liability* incurred under such stat-

ute." Ind.Code Ann. § 1–1–5–1 (West 2001) (emphasis added).

We do not agree that the term "liability," in this context, encompasses rule-making procedural requirements. Moreover, the statute merely established a deadline "*if* [a dispensing fee] adjustment is made following [an annual] survey." Ind.Code § 12–15–31–4 (emphasis added). The statute did not, by its own terms, preclude the action taken here, which was an adjustment made independently of this annual market review process.

■ *2. Administrative Rules Oversight Committee (AROC) Review.* Walgreens argues that FSSA's failure to obtain pre-adoption AROC review invalidates the rule. Indiana Code Ann. § 4–22–2–46 (West 2001) requires AROC to "carry out a program to review each rule adopted under this chapter" if its fiscal impact exceeds $500,000. The review covers economic impact, compliance with legislative intent, extent of any unfunded mandate, and compliance with Ind.Code Ann. § 4–22–2–19.5 (see discussion below). Ind. Code § 4–22–2–46.

Contrary to Walgreens' argument and the trial court's conclusion, this statute plainly governs only the conduct of AROC, which is not a party to this action. FSSA did not violate the statute by adopting the rule without AROC's review.

■ *3. Standards for Rules.* Ind. Code Ann. § 4–22–2–19.5 (West 2001) says, in part:

(a) To the extent possible, a rule adopted under this article ... shall comply with the following:

(1) Minimize the expenses to:

(A) regulated entities that are required to comply with the rule

(B) persons who pay taxes or pay fees for government services affected by the rule; and

(C) consumers of products and services of regulated entities affected by the rule.

(2) Achieve the regulatory goal in the least restrictive manner.

Walgreens argues that FSSA did not even attempt to meet this requirement. FSSA counters that this is a very flexible standard, and correctly points out that while the statute requires "minimiz[ing] the expenses to regulated entities," this rule did not affect pharmacy expenses at all. Ind.Code § 4–22–2–19.5(a)(1)(A); (Appellants' Br. at 22.). Rather, it reduced their revenues.

We agree that "to the extent possible" affords the agency broad latitude in exercising judgment, and that this rule did not alter the pharmacies' compliance expenses. Moreover, this Medicaid cost containment strategy furthered both of the other objectives stated in Ind.Code § 4–22–2–19.5(a)(1)(B) and (C), i.e., minimizing costs to taxpayers and to Medicaid recipients. We therefore conclude that FSSA's failure to offer evidence of any formal analysis to satisfy this statute does not invalidate the permanent rule.

■■■ *4. Payments to Providers Statute.* Indiana Code Ann. § 12–15–13–2(a) (West 2001) requires that payments to Medicaid providers be "(1) consistent with efficiency, economy, and quality of care; and (2) sufficient to enlist enough providers so that care and services are available under Medicaid, at least to the extent that

such care and services are available to the general population in the geographic area."

Gifford worked with an outside consulting firm in deciding what cuts to propose and in assessing whether the cuts would leave Medicaid rates more comparable to non-Medicaid rates. (T.R. at 30.) As we observed above, Walgreens offered testimony only that a handful of pharmacies around Indiana would close as a result of these cuts and that some special services could be eliminated. The record indicates that alternative providers would be available and that FSSA has committed to take appropriate steps to ensure access and a quality of care consistent with that offered to the general public.

On the other side of the coin, revising Medicaid rates so they are more commensurate with private sector rates is consistent with economy and efficiency, as the statute requires. FSSA has therefore met its burden of demonstrating compliance with this statutory requirement.

■■ *5. Advice of Medical Staff.* Indiana Code Ann. § 12–15–21–2 (West 2001) says, "The secretary shall, with the advice of the office[ of Medicaid Policy and Planning]'s medical staff, adopt rules under IC 4–22–2 and consistent with . . . the federal Social Security Act." [11] Indiana Code Ann. § 12–15–21–3 (West 2001) also requires adoption of Medicaid rules, including those "establishing limitations that are consistent with medical necessity concerning the amount, scope, and duration of the services and supplies to be provided."

Walgreens argues that FSSA did not prove that Gifford consulted with the doctor on the Office's medical advisory panel,[12] but Gifford said that the doctor partic-

**11.** Indiana Code article 15 is titled "Medicaid"; chapter 21 is "Rules"; section 2 is "Secretary to adopt rules; consistency with Title XIX of Social Security Act." This statute is therefore a general legislative directive to

FSSA to adopt rules governing Indiana's Medicaid program.

**12.** Gifford was questioned about this during the hearing before the trial court:

ipated in discussions and later testified unequivocally that the Office's medical advisory committee reviewed the proposal.[13] (T.R. at 50, 99–100.) Furthermore, these rules did not eliminate any medically necessary supplies and only potentially eliminated some services that the program does not guarantee, such as home delivery. We therefore hold that the trial court committed clear error in concluding that FSSA violated these statutes.

**6. Fiscal Analysis.** Indiana Code Ann. § 4–22–2–28(b) (West 2001) requires that after an agency has preliminarily adopted any rule with an estimated economic impact on regulated entities exceeding $500,000, it must submit the proposed rule to the Legislative Services Agency (LSA) so that LSA can prepare a fiscal analysis on the effect of compliance on the state and the regulated entities. The analysis must include an estimate of the proposed rule's economic impact and a quantification of any unfunded mandate. *Id.* The agency "shall consider the fiscal analysis as part of the rulemaking process." *Id.*

FSSA concedes that this was not done, but argues that this requirement only applies to rules that create unfunded mandates. This reading contradicts the explicit statutory language that requires "an estimate of the economic impact of the proposed rule *and* a determination concerning the extent to which the proposed rule creates an unfunded mandate...." Ind.Code § 4–22–2–28(b) (emphasis added). FSSA also argues that the exclusive focus of the statute is increased regulatory burdens on businesses, and that this rule does not create such a burden. Again, however, nothing in the statutory language supports such a narrow construction.

We agree with the trial court, therefore, that FSSA should have obtained an LSA fiscal analysis.

The question then becomes, what is the proper remedy. Per Indiana Code Ann. § 4–22–2–44 (West 2001), "A rulemaking action that does not conform with this chapter is invalid, and a rule that is the subject of a noncomplying rulemaking action does not have the effect of law until it is adopted in conformity with this chapter." Before the permanent rule may take effect, therefore, FSSA must obtain LSA's fiscal analysis.

Because the requirement does not attach until after preliminary adoption, FSSA need not go all the way back to square one. Rather, once it has obtained and properly considered an LSA fiscal analysis, it may resubmit the proposed

---

Q. What medical advice did you obtain?
A. What do you mean by medical advice?
Q. Did you talk to a doctor?
A. ... No, I didn't talk to the doctor. But I'm confused about what what you mean by medical advice. That a doctor might know what a pharmacist would find sufficient?
Q. Let's make it simpler. Did you talk with any doctors about what level would be appropriate for either the drug cost reimbursement or the dispensing fee level?
A. I don't believe so. There's a physician on my staff who would have been around the table in some of it, but I don't believe I specifically addressed the question to her.
(T.R. at 50.)

13. Q. ... Was the pharmacy declared reduction reviewed by your medical advisory committee?
A. Yes.
Q. And to the best of your knowledge is there a physician on that committee?
A. Yes.
Q. And I believe you testified earlier that OMPP, Office of Medicaid Policy and Planning, does have a staff pharmacist?
A. Yes.
Q. Did he or she also review the pharmacy declared reduction?
A. Yes.
(T.R. at 99–100.)

rule to the Attorney General's office and proceed toward permanent adoption should it so choose.

### C. Summary—Likelihood of Success on the Merits

To recap, the trial court's conclusions that the emergency and permanent rules violated statutory procedural requirements are clearly erroneous except for the conclusion that FSSA failed to obtain an LSA fiscal analysis of the permanent rule. As stated above, FSSA will have ninety days plus one available ninety-day extension with the emergency rule in effect to rectify this omission.

### IV. Public Interest

 Finally, we conclude that an injunction in favor of Walgreens would disserve the public interest. FSSA adopted rules to counteract a one hundred million dollar projected Medicaid deficit. This action clearly invoked the public interest.[14] On the other hand, Walgreens asserts that a reduction in reimbursement rates will cause a handful of store closures and potential discontinuation of some special services. In essence, Walgreens identifies its private interest and extrapolates that harm to the general public interest. We conclude that the public interest weighs against injunctive relief in favor of Walgreens.

### Conclusion

We reverse the trial court's order of a preliminary injunction.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

---

14. The actions of the General Assembly further demonstrate that this injunction does not better serve the public interest. As described above, P.L. 291–2001 § 48 gave the state budget director extraordinary emergency power to cut Medicaid program expenditures in response to a massive looming deficit.