INDIANA FAMILY & SOCIAL SERVICES ADMINISTRATION, DIVISION OF FAMILY AND CHILDREN, LAKE COUNTY OFFICE, Appellant–Defendant,

v.

ACE FOSTER CARE AND PEDIATRIC HOME NURSING AGENCY CORPORATION, Appellee–Plaintiff.

No. 45A05–0408–CV–447.

Court of Appeals of Indiana.

March 8, 2005.

Steve Carter, Attorney General of Indiana, Joby Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Ivan E. Bodensteiner, Matthew J. Arnold, Douglas Ferngren Arnold & Busse, LLP, Valparaiso, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Indiana Family and Social Services Administration ("FSSA"), Division of Family and Children, Lake County Office, appeals the granting of a preliminary injunction requiring the Lake County Office of Family and Children ("LCOFC") to contract with Ace Foster Care and Pediatric Home Nursing Agency Corporation ("Ace"). We reverse.

### Issue

The dispositive issue is whether the trial court abused its discretion in granting the injunction.

### Facts and Procedural History

LCOFC contracts with various licensed child placing agencies ("LCPAs") to place children in foster care homes in Lake County.[1] In 1999, Elliott Cunningham began working for the Lake County office of Mentor Network ("Mentor"), a national organization. Mentor, an LCPA, had a contract with LCOFC for foster care placement. In 2003, Cunningham left Mentor and founded Ace.

---

1. *See* Ind.Code § 12–7–2–31 (defining "child placing agency" as "a person who provides child welfare services to children and families. The services include home studies, investigation, and recommendation of families for the purpose of placing, arranging, or causing the placement of children for adoption, foster care, or residential care and supervision of those placements."); Ind.Code § 12–7–2–137(a) (defining "person" as "an association, a corporation, a limited liability company, a governmental entity, an individual, or a partnership").

On June 11, 2003, Ace filed an application with FSSA for a license to operate a child placing agency. Thereafter, Ace began negotiating a lease for office space and paid deposits for office furniture and utilities. On November 1, 2003, Cunningham wrote a letter to Ace's prospective landlord apologizing for the delay in finalizing the lease and informing him that the license application was still pending; that Ace had been required to set aside $20,000 to guarantee funding for a three-month budget; that an FSSA licensing consultant had agreed to expedite the application process and was going to inspect the office space on November 6, 2003; and that after the inspection Ace would submit "a contract proposal" to the LCOFC. Plaintiff's Exh. 3. With the letter, Cunningham enclosed a revised lease "including a new start date of December 1, 2003" and a $900 deposit. *Id.*

On November 6, 2003, the FSSA licensing consultant notified Ace that its license application had been approved. On November 9, 2003, Cunningham wrote a letter to LCOFC Director Bruce Hillman informing him that Ace would be sending LCOFC "a child placement contract proposal" by November 17, 2003, and requesting that the proposal be approved "as soon as reasonably possible." Plaintiff's Exh. 4. Cunningham also informed Hillman that Ace could not "sign or commit to a lease for [its] office space until [LCOFC approved its] contract proposal" and that Ace had "several foster parents with foster children who are rather impatient and anxious to transfer their foster care license [from other LCPAs to Ace and] other foster parents, who call for a weekly progress report who are becoming very frustrated in not being able to transfer their license yet." *Id.* On November 17, 2003, Cunning-

ham sent Hillman a "child placement contract proposal" for his "review and approval." Plaintiff's Exh. 1 (cover letter from Cunningham to Hillman).

On November 19, 2003, LCOFC attorney Eugene Velazco called Ace employee (and former Mentor employee) Frank Godinez regarding Ace's contract proposal. According to Godinez, Velazco told him, "It looks good. Things look okay. I don't see any problem with it right now." Tr. at 47–48. Godinez informed Cunningham of this conversation. Cunningham then called Velazco. According to Cunningham, Velazco stated that "he is the one that approves contracts" and that Ace "can start up January the 2nd, [2004,] as long as I have [Ace's] license in my hands[.]" *Id.* at 16. Cunningham told Velazco that Ace's license application had been approved and that he would give Velazco the license as soon as possible. According to Cunningham, Velazco stated, "You're good to go, ... but remember, you have to have three months' expenditures [to] pay your foster care parents, your staff, your rent, your phone bills, you must have three months of cash available, because we will not pay you for three whole months." *Id.* at 17.[2]

On December 5, 2003, Cunningham and Godinez delivered the license to Velazco. According to Cunningham, Velazco stated, "Okay, I have everything I need. You'll be good to go [on January 2, 2004]." *Id.* at 19. Cunningham told Velazco that he "would be entering into some contractual situations" and requested "something in writing." *Id.* at 20. Velazco explained that all LCPA contracts with LCOFC terminated on December 31, whereupon "everybody is under oral contract until Mr. Hillman signs approximately two to three months later." *Id.* Velazco told Cunning-

---

2. At the injunction hearing, Cunningham acknowledged his familiarity with this practice. *See* Tr. at 17 ("That was my experience, right, because when we first started with Mentor, it was the same thing.").

ham, "Once your children are transferred, you notify us and go through the process, and basically we have to pay you." *Id.* When Cunningham asked if he needed to know or do anything else, Velazco responded, "No, I'll inform everyone that you're good to go, and you can arrange your contractual agreements the way you see fit." *Id.* On December 15, 2003, Ace signed a five-year lease for its office space.

On or about December 19, 2003, Cunningham and Godinez met with two LCOFC employees to discuss foster families that had requested a transfer to Ace from Mentor. Cunningham provided the LCOFC with the requisite paperwork to transfer the families effective January 2, 2004. When Ace had not received transfer documents from Mentor as of January 5, 2004, Cunningham called Hillman. At a meeting on January 7, 2004, Hillman informed Cunningham that the LCOFC "could not go through with the contract." *Id.* at 26. According to Cunningham, Hillman stated that LCOFC could not go through with the contract because of a grand jury investigation and because "the county was broke." *Id.* At a subsequent meeting, Hillman told Cunningham "that there were too many agencies, and he was planning on cutting back on the amount of child care agencies." Id. at 28.

On April 28, 2004, Ace filed a three-count complaint against FSSA, seeking damages for breach of contract and the enforcement of LCOFC's promises on grounds of promissory estoppel, as well as alleging a due process violation based on LCOFC's withdrawal of its contract and promises "without providing notice and an opportunity to be heard and without identifying or utilizing any uniform standards applicable to such action." Appellant's App. at 19. Ace also filed a motion for preliminary injunction. On July 13, 2004, the trial court held a hearing on Ace's

motion. On July 20, 2004, the trial court entered an order reading in relevant part as follows:

### *Findings of Fact*

. . . .

12. Acting in reliance on the representations made by Mr. Velazco and other representatives of [LCOFC], ACE entered into a five-year lease for office space (committing ACE to pay $67,000.00 over the five-year period, plus its share of the "common area expenses"), made extensive changes to the interior of the leased premises to convert it to office space, purchased office equipment and computers, obtained utility services, employed at least two individuals, Mr. Godinez and Ms. Whitelow, and arranged for services to be provided by medical professionals. Copies of checks show ACE has already paid more than $10,000.00 in expenses related to these items. While Mr. VanTil, owner of the office space leased by [ACE], has been willing to defer rental payments due in April–July 2004, pending resolution of the motion for a preliminary injunction in this case, he is expecting that rental payments will begin in the very near future. Based on the testimony of Mr. Cunningham, it is apparent that ACE cannot survive as an organization beyond the next few weeks without a contract with and referrals from [LCOFC].

13. In reliance on the representations of Mr. Velazco and other [LCOFC] representatives, Mr. Cunningham has proceeded with the recruitment of new foster parents in Lake County and has developed a list of approximately eighty (80) potential foster parents/ homes. Since there is a constant shortage of foster parents/homes in Lake County, such additional foster homes/parents will facilitate the provision of shelter and

services to children in need of a foster placement in Lake County.

14. The defendant produced no evidence at the hearing to show that it would be harmed in any manner by the issuance of a preliminary injunction in this case. In fact, [LCOFC] has shown no legitimate reason as to why it reversed its decision to do business with ACE and left ACE stuck with commitments it made in reliance upon such decision.

### Conclusions of Law

Based on the evidence presented by the parties at the hearing on July 13, 2004, the court concludes that all of the factors to be considered—likelihood of success on the merits, irreparable harm to the plaintiff, i.e., inadequacy of any remedy available at law, the interests of the parties and the public interest—point in favor of issuing a preliminary injunction.

### ORDER

Having concluded that [ACE] is entitled to a preliminary injunction, [LCOFC] is hereby ordered to:

1. Enter into a written agreement with ACE, consistent with the terms of the agreements between [LCOFC] and the nine LCPAs currently under contract with it, for the provision of foster care-related services for a period of one (1) year, effective no later than August 1, 2004;

2. Notify all foster parents who requested a transfer from Mentor Network to ACE that [LCOFC] now has a contract with ACE and their requests to transfer to ACE will be granted, effective August 1, 2004;

3. Include ACE, along with the other nine LCPAs, whenever [LCOFC] and its agents determine that a child is appropriate for placement through one of the LCPAs; in other words, ACE is to be treated the same as the other nine LCPAs under contract with [LCOFC] in the referral of children for placement through a LCPA;

4. Submit a monthly report on the fifth business day of each month, beginning in September 2004, to counsel for ACE indicating the number of children referred to each of the LCPAs, and the number actually placed with each of the LCPAs, including ACE, during the prior month.

5. ACE shall file a $500.00 bond with the Clerk of this Court on or before July 27, 2004, pursuant to Rule 65(C), in order for this injunction to be effective.

6. This preliminary injunction, when it is effective, shall be in force for one (1) year, unless sooner terminated.

Appellant's App. at 9–11. FSSA now appeals.

### Discussion and Decision

 Our standard of review is well settled:

The grant or denial of a preliminary injunction is within the sound discretion of the trial court, and the scope of appellate review is limited to deciding whether there has been a clear abuse of discretion. The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor.

The trial court's discretion to grant or deny a preliminary injunction is measured by several factors: 1) whether the plaintiff's remedies at law are inadequate thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue; 2)

whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; 3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of injunction may inflict on the defendant; and 4) whether, by the grant of the preliminary injunction, the public interest would be disserved. The party seeking an injunction has the burden of showing, by a preponderance of the evidence, that the facts and circumstances entitle the party to injunctive relief. If the plaintiff fails to prove any one or more of these requirements, the trial court's grant thereof is an abuse of discretion.

*Boatwright v. Celebration Fireworks, Inc.*, 677 N.E.2d 1094, 1096 (Ind.Ct.App.1997) (citations omitted).

■ With respect to the question of irreparable harm, we note that "the ability to obtain damages, in the form of a money judgment for economic injury, represents an adequate remedy at law." *Daugherty v. Allen*, 729 N.E.2d 228, 235 (Ind.Ct.App. 2000), *trans. dismissed.* "A party suffering mere economic injury is not entitled to injunctive relief because damages are sufficient to make the party whole." *Family & Social Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 (Ind.2002). FSSA contends that Ace's alleged injuries are merely economic and that its legal remedies are therefore adequate.

■ In response, Ace points to Cunningham's testimony that its reputation had been damaged.[3] We first observe that Ace did not allege reputation damages in its complaint. We further observe that "[d]amages as a result of injury to reputation and credibility are properly recoverable in a tort action." *Daugherty*, 729 N.E.2d at 235. In other words, Ace would have an adequate legal remedy for such a claim. *Id.* at 236; *see also Mishler v. MAC Systems, Inc.*, 771 N.E.2d 92, 100 (Ind.Ct.App.2002) ("Because [the plaintiff] has the availability of a tort suit to remedy the damages incurred to its reputation as a result of the [defendants'] statements, injunctive relief is not warranted.") (Robb, J., concurring in result).[4] Ace also points to its startup costs, including its lease arrearage, which are economic injuries compensable in damages.

Finally, Ace claims that it "would cease to exist absent injunctive relief." Appellee's Br. at 19 (citing *Family & Social Servs. Admin. v. Cmty. Care Ctrs., Inc.*, 641 N.E.2d 1012 (Ind.Ct.App.1994), *vacated by* 688 N.E.2d 1250 (Ind.1997)).[5] Not-

---

**3.** Ace claims that it "will sustain irreparable damage to its goodwill, trust and reputation if its business is not permitted to function as promised." Appellee's Br. at 17. FSSA points out that Ace's goodwill and trust were not mentioned at the injunction hearing.

**4.** Ace relies on *Unger v. FFW Corp.*, 771 N.E.2d 1240 (Ind.Ct.App.2002), to support its contention that its legal remedies are inadequate *vis-à-vis* its allegedly damaged reputation. *See id.* at 1246 (concluding that plaintiff corporation's legal remedies were inadequate where CEO testified that he "could not put a dollar amount" on damages "to its goodwill, a loss of client confidence, a loss of business reputation, and a loss of the ability to com-

pete fairly" as a result of defendant's actions). We find *Unger* unpersuasive. Unlike the corporation in that case, Ace is a startup company and therefore can readily quantify any damages to its fledgling goodwill and reputation.

**5.** Ace's citation does not indicate that our supreme court vacated our court's opinion in *Community Care Centers*, thereby negating its precedential value. *See Estate of Helms v. Helms–Hawkins*, 804 N.E.2d 1260, 1268 n. 4 (Ind.Ct.App.2004) (stating that when transfer is granted and opinion vacated, "the court of appeals opinion is held for naught and has no precedential value"). We remind Ace's counsel of their duty of candor toward the tribunal

withstanding this dire prediction,[6] we note that when Ace requested the injunction, its alleged damages were limited to startup costs and those flowing from the alleged breach of contract, for which an adequate legal remedy is available. Ace has failed to demonstrate irreparable harm. We therefore conclude that the trial court abused its discretion in granting the injunction.[7] Accordingly, we reverse.

Reversed.

RILEY, J., and ROBB, J., concur.

under Indiana Professional Conduct Rule 3.3 and admonish them to check citations more carefully in the future.

6. Ace asserts that "[i]t would lose its sole office; it would lose its reputation and trust in the only community it serves (Lake County); it would lose its one and only opportunity to function as a going concern." Appellee's Br. at 19. It is interesting to note that in Ace's contract proposal to LCOFC, Cunningham described his "challenging position" as the former coordinator of Mentor's Lake County office, which entailed "work[ing] alone and out of his home until he had recruited enough foster families so that at least four foster children were placed within the program." Plaintiff's Exh. 1 at 3. Ace's origins were decidedly less humble, in that it signed a five-year lease for 3500 square feet of office space before it had placed any children in foster care. Plaintiff's Exh. 12 at 1.

7. In a footnote, Ace baldly asserts that its remedies at law would be inadequate if FSSA is entitled to "immunity from damages," as FSSA alleged in its answer to Ace's complaint. Appellee's Br. at 18 n. 9. Absent a determination of FSSA's immunity, Ace's unsupported assertion falls far short of the preponderance of the evidence necessary to sustain its burden. *See Boatwright,* 677 N.E.2d at 1096 (stating evidentiary burden for party seeking injunction). In another footnote, Ace invites us to take judicial notice of FSSA's approval of its Title IV–E foster care reimbursement rate, which occurred after the initiation of this appeal. *Id.* at 5 n. 3. Given our resolution of this appeal, we summarily decline Ace's invitation. Likewise, we need not address FSSA's argument that the trial court violated the separation of powers doctrine by granting the injunction. *See* IND. CONST. art. III, § 1 ("The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial: and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."); *Daugherty,* 729 N.E.2d at 233 (noting that doctrine of judicial restraint precludes "gratuitous judicial review of constitutional questions").