

**FILED**

Mar 10 2016, 7:45 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT
Kevin W. Betz
Sandra L. Blevins
Jamie A. Maddox
Courtney E. Endwright
Betz & Blevins
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
COMMUNITY HOWARD
REGIONAL HEALTH, INC. ET AL.
Sherry A. Fabina-Abney
L. Alan Whaley
Melanie E. Harris
Olga Voinarevich
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES THE
CLEVELAND CLINIC FOUNDATION
ET AL.
Ronald A. Mingus
Logan C. Hughes
Reminger Co., L.P.A.
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
THE INDIANA HOSPITAL
ASSOCIATION
Angela M. Smith
Hall, Render, Killian, Heath &
Lyman, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael E. Ritchie, M.D.,

*Appellant-Plaintiff,*

v.

Community Howard Regional
Health, Inc., et al.

*Appellees-Defendants.*

March 10, 2016

Court of Appeals Case No.
34A02-1505-PL-385

Appeal from the Howard County
Superior Court 2

The Honorable Brant J. Parry,
Judge

Trial Court Cause No.
34D02-1411-PL-952

**Bailey, Judge.**

# Case Summary

The Medical Executive Committee ("the MEC") of Community Howard
Regional Health, Inc. ("Community") issued a precautionary suspension of
medical staff privileges[1] extended to Michael E. Ritchie, M.D., the President
and CEO of Ritchie Cardiology, P.C. Dr. Ritchie filed suit for breach of
contract, defamation, tortious interference with a business or contractual
relationship, intentional infliction of emotional distress, and breach of fiduciary
duty.[2] He sought temporary, preliminary, and permanent injunctive relief. A

---

[1] Section 5.3 of Community's By-Laws provides for a "precautionary suspension" when "failure to take
action may result in imminent danger to the health or safety of any individual or may disrupt the orderly
operation of the Hospital." (App. at 189.) Subsection (c) specifies that a precautionary suspension "is an
interim step in the professional review activity, but it is not a complete professional review action in and of
itself." (App. at 189.)

[2] The defendants included Community, Interim Chief Executive Officer Ron Lewis, Techsin Ty, M.D.,
Community staff (Eric O'Banion, M.D., Erika Cornett, M.D., James Downing, M.D., Andrew Mandery,
M.D., Mohammad Nekoomaram, M.D., John Salter, M.D., Carol Sheridan, M.D., Blake Marti, M.D.,

temporary restraining order was granted but later dissolved and Dr. Richie was denied a preliminary injunction. He appeals, presenting the sole consolidated and restated issue of whether the trial court clearly abused its discretion.[3] We affirm.

# Facts and Procedural History

For twelve years, Dr. Ritchie, who maintained a private practice, provided services as an interventional cardiologist at Howard Regional Hospital in Kokomo. On July 1, 2012, Howard Regional Hospital became part of Community Health Network ("CHN"), and Community Physicians of Indiana, Inc. d/b/a Community Physician Network ("CPN") became the exclusive provider of cardiovascular services at Community.

In 2013, CHN contacted the Cleveland Clinic Foundation ("Cleveland") to discuss a potential CHN affiliation with Cleveland as to the provision of

---

Ramaroa Yeleti, M.D., Lawrence Gehring, M.D., Lawrence Klein, M.D., Michael Koelsch, M.D., Blaire McPhail, M.D., Rajesh Mallella, M.D., Jaro Mayda, M.D., Ghaith Nahlawi, M.D., and Dorian Beasley, M.D.), and Cleveland Clinic defendants (The Cleveland Clinic Foundation, The Cleveland Clinic Health System Physician Organization, Joseph Cacchione, M.D., Christopher Bajzer, M.D., and Amar Krishnaswamy, M.D.). The providers were named as defendants individually and in their official capacities.

[3] Dr. Ritchie articulates an additional issue, supported by a cursory allegation that the good faith presumption in Indiana's peer review statutory scheme "has no connection to a proven fact" and is thus void, unenforceable, and unconstitutional. Appellant's Br. at 45. However, he does not assert that he filed a claim for a declaratory judgment, providing the defendants with an opportunity to respond, or that he gave timely notice to the Indiana Attorney General to facilitate intervention. *See* Ind. Code § 34-14-1-11 (providing in relevant part: "In any proceeding in which a statute, ordinance, or franchise is alleged to be unconstitutional, the court shall certify this fact to the attorney general, and the attorney general shall be permitted to intervene for presentation of evidence[.]"). Dr. Ritchie's bald assertion of unconstitutionality does not properly raise an issue of alleged trial court error for review.

cardiovascular services. A services agreement was executed in February of 2014 and CHN agreed to pay Cleveland a consulting fee for a "quality assessment for cardiovascular product line for the entire network." (App. at 1182.) After evaluation, Cleveland could determine whether or not CHN would be offered participation in the Cleveland national cardiac network.

[4] Dr. Ritchie was advised, by a letter dated December 19, 2013, that a provider not becoming a part of CPN "[as] an employee or independent contractor with CPN" could exercise clinical privileges up to midnight on December 31, 2013. (Ex. 102.) Pursuant to a verbal agreement with CPN President Dr. Ramarao Yeleti, Dr. Ritchie was permitted to continue exercising his medical staff privileges and performing procedures at Community as an independent contractor.[4] On November 3, 2014, a hand-delivered letter addressed to Dr. Ritchie advised: "Effective immediately, we are terminating the verbal agreement with Ritchie Cardiology, PC and you to provide professional cardiology services to Hospital patients." (Ex. 8.)

[5] At some point, the MEC requested that Cleveland "do a medical review" of three procedures at Community. (App. at 1184.) On June 25, 2014, the MEC imposed a moratorium on three procedures: use of Impella devices,[5] balloon

---

[4] Dr. Yeleti explained that a hospital board of directors extends privileges to a physician, but "delivery of the privileges" requires employment or an independent contractor agreement with the network of physicians having an exclusivity agreement with the hospital. (Tr. at 337.)

[5] Dr. Ritchie described this as a "support device" or "little pump" placed in a heart ventricle. (Tr. at 91.)

valvuloplasties,[6] and percutaneous atrial septal defect closures.[7] These procedures had been performed at Community exclusively or almost-exclusively by Dr. Ritchie. A peer review letter informed cardiologists and cardiothoracic surgeons of the moratorium and further advised:

> Similar to Community Health Network's arrangement with the MD Anderson Cancer Network Affiliation, Community Health Network is working toward an affiliation with the Cleveland Clinic for its cardiology service lines. As part of that endeavor, the Cleveland Clinic has been evaluating the policies, procedures, and practices of the various cardiovascular programs within the network including Community Howard Regional Health.

(App. at 114.)

[6] On September 4, 2014, Community's Medical Audit and Review Committee concluded an audit sampling 40 of 93 of Dr. Ritchie's cases and advised Dr. Richie by written memorandum:

> Congratulations are extended as you demonstrated excellent performance and documentation. We are proud to have you on our staff.

(App. at 117.)

---

[6] Dr. Ritchie described this as "a balloon that cracks open the valve." (Tr. at 91.)

[7] This was described as something "like an umbrella." (Tr. at 91.)

[7] On October 16, 2014, the MEC held a regularly scheduled monthly meeting. At that meeting, Cleveland presented its evaluation of the cardiovascular services of Community. The MEC discussed this evaluation and other alleged complains regarding Dr. Ritchie. After the meeting concluded, the interim CEO and the Chief of Staff of Community verbally informed Dr. Ritchie of an adverse recommendation concerning his hospital privileges.

[8] On October 18, 2014, the MEC issued a written "Notice of Precautionary Suspension and Recommendation to Terminate Membership and Privileges" with regard to Dr. Ritchie. (App. at 147.) Dr. Ritchie was informed that the recommendations were based upon results of case reviews conducted by Cleveland physicians. Allegedly, "a significant number of the cases … were found to be outside the appropriate standard of care." (App. at 147.) Dr. Ritchie was advised that he was entitled to a non-hearing meeting with the MEC within fourteen days of the suspension, and that he could request a hearing before a committee of three physicians from the active medical staff ("the By-Laws hearing").[8] The By-Laws hearing would involve the opportunity for the MEC and Dr. Ritchie to call, directly examine, and cross-examine witnesses.

---

[8] Pursuant to Indiana's Peer Review Act, a physician facing charges that, if sustained, could result in an action reportable to a medical licensing board, must be afforded one evidentiary hearing before a peer review committee of the medical staff and one appeal before the governing board of the hospital or a committee appointed by the governing board. I.C. § 34-30-15-5.

[9] The MEC held two additional meetings – on October 30 and November 3, 2014 – to "[give] the opportunity for Dr. Ritchie to provide further information[.]" (Tr. at 208.) Dr. Ritchie appeared, read a statement, and challenged the process implemented by Cleveland. Dr. Ritchie was advised to submit any additional patient-care materials for consideration by November 7, 2014.

[10] On November 7, 2014, Dr. Ritchie filed a complaint naming as defendants Community, CHN, CPN, the Cleveland Clinic Foundation, the Cleveland Clinic Health System Physician Organization, and various health care providers and hospital administrators. Dr. Ritchie's complaint alleged that the peer review process was a sham proceeding, he had provided appropriate and independently reviewed cardiology services, the MEC and Cleveland Clinic defendants had an economic interest in divesting Dr. Ritchie of his patients, patients were put at risk by the suspension, and the reporting of suspension of privileges to state and federal entities could irreparably damage Dr. Ritchie's professional reputation and practice.

[11] Dr. Ritchie requested a temporary, preliminary, and permanent injunction that would require Community to restore Dr. Ritchie's medical staff privileges, prohibit reporting of the suspension to third parties, and halt the "sham process" implemented by Community. (App. at 112.) Dr. Ritchie also sought compensatory and punitive damages and attorney's fees.

[12] On November 10, 2014, the trial court issued an order granting to Dr. Ritchie a portion of the temporary injunctive relief he had requested. Although Dr.

Ritchie did not obtain restoration of his clinical privileges or a moratorium on the peer review proceedings, the defendants were enjoined from making reports concerning Dr. Ritchie to: The National Practitioner Data Bank; the Medical Licensing Board of Indiana; the Indiana Professional Licensing Agency; the Indiana State Department of Health; the Indiana Department of Insurance; the Office of the Indiana Attorney General; any other state licensing agency; and "any other entity to whom the Defendants feel they are obligated by law to report the suspension or termination of privileges of staff members." (App. at 386.)

[13] After the commencement of his lawsuit, Dr. Ritchie requested a By-Laws hearing and provided medical records to the MEC. He also requested a continuance of the By-Laws hearing, pending the resolution of his petition for injunctive relief in state court. The medical records were reviewed at a third special meeting of the MEC on December 3, 2014.

[14] The defendants filed a Motion to Dismiss the Application for Injunctive Relief and Dissolve the Temporary Restraining Order. The trial court denied the motion on December 1, 2014. On December 8 and 11, 2014 and on January 8, 2015, the trial court conducted evidentiary hearings on injunctive relief.

[15] On April 20, 2015, the trial court issued an order denying Dr. Ritchie's request for a preliminary injunction and dissolving the temporary restraining order of November 10, 2014. The trial court concluded that Dr. Ritchie failed to exhaust his administrative remedies available in Community's peer review

process, thus foreclosing a review of the likelihood of success on the merits; he did not show requisite bad faith on the part of the peer review committee to overcome a peer review anti-injunction statute; and he fell short of establishing the essential elements for injunctive relief. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

[16] The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion. *Ind. Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the trial court or when the trial court misinterprets the law. *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.*, 820 N.E.2d 158, 163 (Ind. Ct. App. 2005), *trans. denied*. When determining whether or not to grant a preliminary injunction, the trial court is required, pursuant to Indiana Trial Rule 52(A), to make special findings of fact and conclusions of law. *Id.* When findings and conclusions of law are made, the reviewing court must determine if the trial court's findings support the judgment. *Id.* We will reverse the judgment only when it is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* We will consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Id.*

[17] Additionally, Dr. Ritchie is appealing from a negative judgment and must therefore establish that the trial court's judgment is contrary to law. *Pinnacle Healthcare, LLC v. Sheets*, 17 N.E.3d 947, 953 (Ind. Ct. App. 2014). A judgment is contrary to law if the evidence of record, together with the reasonable inferences to be drawn from that evidence, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. *Id.*

## *Analysis*

[18] To obtain a preliminary injunction, the moving party bears the burden of showing by a preponderance of the evidence each of the following: (1) the movant's remedies at law were inadequate, causing irreparable harm pending resolution of the substantive action; (2) the moving party had at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) the threatened injury outweighs the potential harm resulting from the granting of an injunction; and (4) the public interest would not be disserved. *Id.* A preliminary injunction is an extraordinary remedy that should be used only in rare circumstances in which the law and the facts are clearly within the moving party's favor. *Crossman Communities, Inc. v. Dean*, 767 N.E.2d 1035, 1040 (Ind. Ct. App. 2002).

[19] Additionally, Indiana's Peer Review Act, Indiana Code Sections 34-30-15-1 through 34-30-15-23, limits the availability of injunctive relief. Indiana Code Section 34-30-15-18 provides:

No restraining order or injunction shall be issued against a peer review committee or any of the personnel thereof to interfere with the proper functions of the committee acting in good faith in regard to evaluation of patient care as that term is defined and limited in IC 34-6-2-44.

[20] Indiana Code Section 34-30-15-23 provides:

In all actions to which this chapter applies, good faith shall be presumed, and malice shall be required to be proven by the person aggrieved.

[21] Also, as the defendants point out, "[i]t is fundamental Indiana law that a party must exhaust his administrative remedies before suit may be brought in a trial court." *St. Joseph's Hosp., Inc. of Ft. Wayne v. Huntington Cnty. Dep't of Pub. Welfare*, 405 N.E.2d 627, 630 (Ind. Ct. App. 1980). Accordingly, to be entitled to the injunctive relief requested, Dr. Ritchie first had to show that the peer review anti-injunction provision was inapplicable and that he should be excused from compliance with exhaustion of administrative remedies, and then he had to establish the requisite common law elements for a grant of injunctive relief.

[22] The trial court concluded that the MEC was functioning as a peer review committee, presumptively acting in good faith, and that Dr. Ritchie had not proven that the MEC acted with malice. Thus, the anti-injunction provision was applicable. Moreover, the trial court concluded that, if the anti-injunction provision was inapplicable to some aspects of the relief sought, Dr. Ritchie established less than all of the requisite criteria for injunctive relief. According to the trial court, Dr. Ritchie presented evidence that irreparable harm to him

might ensue (but, based on testimony by Community's expert, damages for such were calculable); a reasonable likelihood of success on the merits could not be determined at such an early stage of proceedings; Dr. Richie's threatened harm outweighed the threatened harm from granting an injunction (because the precautionary suspension removed Dr. Ritchie's ability to practice on patients); and the element as to public service was not established.[9] Ultimately, the trial court found "the Plaintiff is asking the Court to substitute its judgment for that of the MEC and the doctors that it consulted with." (App. at 85.)

[23] As for exhaustion of administrative remedies, Dr. Ritchie claims that he is entitled to the benefit of an exception for futility,[10] because the MEC is engaging in sham proceedings. According to Dr. Ritchie, there are hallmarks of such; more specifically: The Cleveland Clinic reviewers had a conflict of interest because there is a financial arrangement between Community and The Cleveland Clinic; The Cleveland Clinic is motivated to impose its own protocols; the reviewers acknowledged the need for more information as a predicate to the issuance of a report with "complete perspective"; the charges were lodged shortly after Dr. Ritchie was commended by Community reviewers for his excellent work; and the Cleveland Clinic reviewers stopped short of

---

[9] The trial court misstated Dr. Richie's burden of proof as requiring him to show that a preliminary injunction would serve the public interest, as opposed to showing that the public interest would not be disserved.

[10] *See Smith v. State Lottery Comm'n*, 701 N.E.2d 926, 931 (Ind. Ct. App. 1998) (recognizing an exception to the exhaustion requirement when the remedy is inadequate or would be futile, or when some equitable consideration precludes application of the rule).

clearly proclaiming that the evaluated patients had been placed in danger. (Ex. 6 pg. 4.)

[24] Apparently due to a firm conviction that the peer review proceedings surrounding the presentation of the Cleveland report were fundamentally flawed, Dr. Ritchie's presentation of evidence to the trial court was largely an attack on the process. He purported to shed light on Community's true motivation: diversion of Dr. Ritchie's patients and consequent financial gain. Witnesses testified to instances in which they believed insurance considerations or data collection took precedence over patient care considerations at Community. Meanwhile, Dr. Ritchie was portrayed as professional, attentive, even a lifesaver.

[25] With this background, and his insistence that professional reporting of even an interim suspension would irreparably harm his career, Dr. Ritchie claims that he has demonstrated the futility of continuing with the By-Laws hearing. We acknowledge Dr. Ritchie's frustrations with the lack of fixed time limits in the By-Laws and his fear of damage to his professional reputation. Nonetheless,

> the overwhelming majority rule is that harm to professional reputation is not the kind of irreparable injury that forms the basis for equitable relief. Bad publicity generated by revocation of a license is not deemed to be the type of irreparable injury contemplated, and injunctions have been almost uniformly denied to professionals seeking to stop license revocation hearings because of damage to their reputation.

*Thompson v. Medical Licensing Bd.*, 389 N.E.2d 43, 49 (Ind. Ct. App. 1979).

[26] Moreover, even if we agree that there is significantly more at stake than monetary loss, we simply cannot, as a practical matter, reach a well-advised conclusion on the limited record developed. As the trial court observed, the lack of finality to the administrative proceedings hampers examination of the likelihood of success on the merits of Dr. Ritchie's multiple claims.

[27] By Dr. Ritchie's own account, more information was needed to form a final opinion on his compliance with an appropriate standard of patient care. Indeed, Dr. Ritchie's application for a temporary restraining order and preliminary injunction asserted: "because Dr. Ritchie has a separate, independent practice from the hospital and CPN, the Cleveland Clinic reviewers did not review 80% of the information they needed to assess Dr. Ritchie's performance." (App. at 158.) However, the By-Laws hearing (with opportunity for Dr. Ritchie to offer information and conduct cross-examination) was not concluded before suit and the trial court was asked to assess merits that would predictably be impacted upon by greater inclusion of materials. Rather than focusing on whether Dr. Ritchie was likely to prevail on his claims, the trial court hearings focused upon alleged deficiencies of the peer review committee. By launching an early attack on the process and members of the peer review committee, Dr. Ritchie has diverted attention from the provision of medical services and delayed any ultimate decision.

[28] Dr. Ritchie would suffer greater harm than would Community from dissemination of adverse reports if Dr. Ritchie did not and does not pose a danger to patients. The public would not be dis-served, and indeed would be

served, by allowing a competent interventional cardiologist to exercise his skills. However, only limited records have been examined. The focus of Dr. Richie's expert witness Dr. Huntoon has largely been upon whether a sham process was in progress. Dr. Ritchie has essentially sought a determination of the adequacy of peer review proceedings.

[29] But ultimately, the peer review proceedings – and Dr. Ritchie's expectation of success on the merits of his claims – concern the adequacy of care provided to patients. Indeed, Dr. Thomas Forbes executed an affidavit in which he stated that, "after reviewing the additional documentation from Dr. Ritchie that Drs. Krishnaswamy and Bajzer should have reviewed before issuing their report and the MEC should have reviewed before imposing a precautionary suspension," he had concluded that Dr. Ritchie "performed his professional duties appropriately." (App. at 528.) Noticeably, the "additional documentation" was not submitted to the MEC in a By-Laws hearing. The By-Laws hearing is the statutory means of reviewing the adequacy of patient care. It may be followed by an administrative appeal. *See* I.C. § 34-30-15-5.

[30] As the trial court observed:

> The Indiana General Assembly has specifically created statutes entrusting the governing boards of hospitals with the "supreme authority" to control, operate, and manage the hospital, as well as appoint, reappoint, and assign privileges of the medical staff. The Legislature has enacted a framework of peer review where [a] physician's competence, conduct, and patient care are reviewed by other medical staff of the hospital. The Legislature has indicated how important the peer review procedures are by

establishing immunity for boards and their agents[.] … These
actions by the General Assembly demonstrate the important
public policy aimed at improving the quality of care within our
hospitals.

(App. at 85.) Absent malice, the peer review committee is the legislature's choice for dealing with these issues. Courts are ill-equipped to conduct an independent review of patient care absent evidence from expert witnesses on the standard of care and any countervailing evidence in opposition thereto. Because of this limitation, state trial and appellate courts cannot serve as substitutes for peer review committees and the aggrieved party cannot circumvent the administrative process.

# Conclusion

[31] Dr. Ritchie did not demonstrate his entitlement to extraordinary equitable relief. Accordingly, the trial court did not clearly abuse its discretion by denying the request for a preliminary injunction.

[32] Affirmed.

Vaidik, C.J., and Crone, J., concur.