AGS CAPITAL CORP., INC., AGS Capital, LLC, Scott A. Weaver, Alan G. Symons, Superior Metal Technologies, LLC, Fast Tek Group, Llc, Anthony Roark, and Chan Chanthaphone, Appellants–Defendants,

Philip "Kirk" Ridenour, William R. Sewell, Ronald R. Scott, Meredith Boatright, Defendants,

v.

PRODUCT ACTION INTERNATIONAL, LLC, Successor to Product Action International, Inc., Appellee–Plaintiff.

No. 49A02–0702–CV–176.

Court of Appeals of Indiana.

April 11, 2008.

James H. Hanson, Lynne D. Lidke, Robert L. Browning, Scopelitis, Garvin, Light, Hanson & Feary Indianapolis, IN, Attorneys for Appellants AGS Capital Corp., Inc., AGS Capital, LLC, Scott A. Weaver, Alan G. Symons, Superior Metal Technologies, LLC, and Fast Tek Group, LLC.

Paul D. Ludwig, Bator, Redman, Bruner, Shive & Ludwig, P.C., Indianapolis, IN, Attorneys for Appellants Anthony Roark and Chan Chanthaphone.

Julia Blackwell Gelinas, Alan S. Brown, Melanie D. Margolin, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

In this interlocutory appeal, AGS Capital Corporation, Inc., AGS Capital, LLC (collectively "AGS"), Fast Tek Group, LLC ("Fast Tek"), Superior Metal Technologies, LLC ("Superior Metal"), Alan G. Symons, Scott A. Weaver, Anthony Roark, and Chan Chanthaphone (collectively "Appellants") appeal the trial court's grant of preliminary injunction to Product Action International, LLC ("Product Action"). We affirm in part, reverse in part, and remand for further proceedings.

### Issues

The Appellants raise numerous issues, which we reorder and restate as:

I. Whether Indiana's Uniform Trade Secrets Act preempts Product Action's claim under Indiana's Racketeer Influenced and Corrupt Organizations ("RICO") statute;

II. Whether the trial court's ruling that Product Action established a *prima facie* case that the Appellants misappropriated trade secrets was clearly erroneous;

III. Whether the trial court's ruling that Product Action established a *prima facie* case that the Appellees violated Indiana's RICO statute was clearly erroneous;

IV. Whether the trial court's finding that Fast Tek and AGS are "alter egos" is clearly erroneous;

V. Whether the trial court erred in concluding that Product Action would suffer irreparable harm without an injunction;

VI. Whether the preliminary injunction is overbroad; and

VII. Whether the $2000 injunction bond to be posted by Product Action is unreasonably low.

### Facts and Procedural History

Product Action is in the business of quality control, providing sorting, inspection, rework, containment and engineering services to assist its customers in handling quality issues. Its customers are manufacturers and suppliers primarily in the automotive industry. Product Action has been in business since 1980, employs roughly three thousand individuals, and is headquartered in Indianapolis. In December of 2004, Product Action underwent a corporate reorganization that included restructuring the company as an LLC. In

this process all rights from the former entity, Product Action International, Inc., were transferred to Product Action International, LLC.

Throughout its years of operation, Product Action has developed methods and processes to deliver its quality control services quickly and consistently to its customers throughout the United States and Canada. This information has been compiled over the years based on the company's experiences and innovation and is documented particularly in their Quality Management Systems ("QMS") manual. The QMS manual uses flow charts, forms, and written descriptions to depict Product Action's processes from the intake of work through billing and collections. Product Action considers this documentation confidential and has set up safeguards to protect it, such as requiring employees to sign confidentiality agreements and utilizing password protection for the network drive where the manual is stored. In addition to its QMS manual, Product Action's network drive also contains documents pertaining to its operating procedures, sales and marketing strategies, customer lists, pricing plans, sales proposals, and systems and processes.

In September of 2003, AGS Capital, LLC, purchased Fast Tek, a direct competitor of Product Action, from Phillip Grove ("Grove") for $50,000. Grove continued to work at Fast Tek as its chief operating officer and later as executive vice president of strategic planning. Alan G. Symons ("Symons") and Scott A. Weaver ("Weaver") are the owners of AGS with interests of 85% and 15% respectively. "AGS" stands for Alan G. Symons. In addition to Fast Tek, AGS also owns several other companies, including Sam's

Technical Publishing ("Sam's Publishing") and Superior Metal. AGS employees regularly performed work for Fast Tek as well as the other AGS-owned companies, including IT, accounting, human resources, and sales and marketing functions.

Weaver was president of Fast Tek from August of 2003 to December of 2006.[1] Symons has served as chief executive officer of Fast Tek from the time AGS acquired Fast Tek. Weaver and Symons were paid by AGS for their services rather than receiving a salary from Fast Tek. In their official capacities at Fast Tek, Weaver and Symons were involved in the day-to-day management of Fast Tek by signing checks for the company, attending management meetings, making decisions regarding personnel, collections, sales and employee performance issues.

In an effort to quickly make Fast Tek a profitable company, Symons, Weaver, and Grove discussed strategies such as acquiring and utilizing terms and conditions, forms, documents, processes, trade secrets, confidential information, business plans, and business models of their competitors. Symons regularly mentioned Product Action as a good competitor to emulate. In these conversations, it was noted that Product Action had grown quickly and had an excellent reputation in the industry. Two of Fast Tek's goals, as set by Symons, Weaver, and Grove, were to hire individuals with knowledge and experience in the industry, particularly employees of Product Action, and to acquire and utilize Product Action's business model.

On September 8, 2003, in a meeting with Grove and Chrisie Van Meter ("Van Meter"), Weaver's personal secretary, Weaver

---

**1.** Weaver resigned from Fast Tek forty-five days prior to the preliminary injunction hearing.

instructed Van Meter to call Product Action to request a price quotation to be sent to her for Superior Metal. The purpose of requesting the quotation was to obtain Product Action's pricing in order to set Fast Tek's pricing on its services. Van Meter did as instructed and received a quotation for Superior Metal from Product Action, passing the information on for Fast Tek's use.

In 2004, Weaver and Grove were able to convince one of Fast Tek's customers to send them a copy of Product Action's terms of service letter. Weaver directed the secretarial staff to retype the letter, replacing any reference of "Product Action" to "Fast Tek." However, one reference was not altered. For months after the revised letter was utilized and sent to customers of Fast Tek, a portion of Fast Tek's new terms of service letter read: "In no event shall Product Action's cumulative liability to the customer under these terms of services agreement exceed $5,000.00." Hearing Transcript at 709.

From January of 2000 to December of 2002, Anthony Roark ("Roark") was employed by Product Action as a member of the Quality Team that developed and improved the operational processes and procedures utilized by Product Action. In his role on the Quality Team, Roark had access to all of Product Action's information regarding its systems, methods, and processes that could only be accessed by a company issued username and password. As required of all Product Action employees, Roark signed a confidentiality and non-compete agreement.

During his employment at Product Action, Roark copied the information on Product Action's password protected network drive onto a zip drive. The QMS manual was a part of the information on the zip drive. Roark retained this zip drive after leaving the employ of Product Action.

Fast Tek hired Roark in June of 2004 as a trainer in its Michigan office. Shortly after starting his job with Fast Tek, Roark indicated to Grove that he had materials from Product Action. Grove described the content of this material as "Product Action's entire business operating system, or their quality management system." Hearing Trans. at 674. Weaver admitted at the preliminary injunction hearing that he knew Roark had Product Action documents, including the QMS manual and did not take any measures to prevent the use of those documents at Fast Tek. Soon thereafter, despite some of the documents containing labels of "confidential" and "copyrighted," Roark began e-mailing some of the materials to Grove. The documents were altered and assimilated into Fast Tek's daily operations. Eventually, it was widely known among Fast Tek employees that Roark had a library of materials from Product Action.

Within 120 days of starting with Fast Tek, Roark was promoted to vice president of operations. This promotion was based on the library of Product Action documents stored on the zip drive and Roark's ability to implement those processes within Fast Tek.

Weaver, Grove, and Roark discussed and decided to adopt processes from the Product Action QMS manual to be utilized at Fast Tek and provide the needed training to Fast Tek employees. In December of 2004, there was a Fast Tek management meeting at which managers from every branch location as well as the executive management team were present. These individuals were trained on the processes and procedures that were taken from the Product Action QMS manual provided by Roark. The documents utilized in the

training were identical to those documents taken off Product Action's network drive.

Chan Chanthaphone ("Chan") worked for Product Action from September of 2002 until May of 2006 as a quality engineer. Similar to Roark, Chan signed a confidentiality and non-compete agreement. In the engineering department, Chan worked on developing and improving methods, processes, sales activity, and operations activity and also worked with the sales and business development team to court new customers. At some point, Chan expressed a desire to transfer to the sales division at Product Action. Instead of transferring her to sales, her manager expanded Chan's sales activity within her existing engineering position. Due to her various areas of responsibility, Chan had access to Product Action's quality, engineering, business development, sales, and marketing information. This information was stored on Product Action's database and was password protected.

In March of 2006, Chan engaged in talks with Fast Tek about her possible employment. On March 27, 2006, Chan, while still employed at Product Action, requested a password from the IT department to access Product Action's Customer Management System ("CMS") database, which contained confidential customer contact, ordered projects, and pricing information. Upon her request, Chan was provided the two required passwords to access the database. The next day Chan requested and received a copy of Product Action's general sales presentation from the sales coordinator. On April 24, 2007, Chan was offered the position of director of sales at Fast Tek, and she accepted two days later. When they offered her the job, Fast Tek knew that Chan was working for Product Action and had signed a non-compete agreement, because Chan had provided a

copy of the non-compete agreement at one of the Fast Tek interviews.

On April 27, 2006, Chan e-mailed her resignation letter to her manager at Product Action. The letter provided that it served as her formal two-week notice and that Chan's last day at Product Action would be May 12, 2006. Chan also expressed her willingness to train her replacement until her last day at the company.

The day after submitting her resignation letter, Chan sent e-mails from her work account to her personal e-mail account, attaching documents pertaining to particular Product Action customers. On May 1, 2006, Chan e-mailed to her personal e-mail account the Product Action's April 28th weekly management report, which was labeled "confidential" on each page. This report included detailed information regarding numerous current and prospective customers of Product Action as well as its marketing efforts. Five days later at 3:00 a.m., Chan e-mailed a PowerPoint presentation regarding a system used by another Product Action customer. These and multiple other confidential documents that Chan sent to herself were still on her home computer at the time of the hearing. Chan admitted that all of this information was confidential, not publicly available and that she had not informed Product Action that she was sending this information.

In addition to taking information from Product Action electronically, Chan removed and retained printed confidential documents from her prior employer. Chan also downloaded information from one of Product Action's network drives onto disks and cds. This downloaded information ranged from engineering information to specific information on projects and processes for particular clients to an archive of Chan's entire C drive of her

computer she utilized while working for Product Action.

While working for Fast Tek in her role as director of sales, Chan called on at least four of the companies whose confidential documents she had e-mailed to herself while employed at Product Action. Chan testified that one of the selling points she would use during a pitch was that Fast Tek's prices were lower than Product Action's. In addition to using this information in fulfilling her responsibilities at Fast Tek, Chan shared her documentation with Fast Tek management and employees, commencing on her first day of work. In her e-mails sending Product Action information to individuals working for Fast Tek, Chan did not disguise that her information was from Product Action and provided detailed information regarding Product Action's latest contracts and projects of its customers. She concluded one of her e-mails that listed Product Action's recent customer activity stating: "I think that's about it. I have additional information for Northern Region and Indiana." Exhibit 281.

On May 8, 2006, Product Action filed a Verified Complaint for Preliminary Injunction, Permanent Injunction, and Damages against the Appellants. A Second Amended Complaint was filed on August 28, 2006. For discovery purposes, Product Action employed Rebecca Hendricks ("Hendricks"), a consultant in computer forensics. The parties stipulated to Hendricks performing electronic discovery on Fast Tek's computer hard drives, exchange server, and file server. To retrieve the needed data, Hendricks took mirror images of the drives and servers in order to extract active as well as deleted files that were still recoverable. A certain harvesting software was used to retrieve the documents and files within the mirror images, indexing the results. Then a key word search, such as "Product Action," was used to find relevant documents. The indexed results indicated for each document or e-mail retrieved: the computer or device from which it was retrieved, the serial number of the device, and the index number.

The searches of these indexed files and documents by the key word "Product Action" resulted in thousands of hits. The items found in the search consisted of documents that Fast Tek took from Product Action that had been converted, with minor changes, for use by Fast Tek and documents from Product Action that were in their original form. Hendricks also performed a document comparison between the Product Action QMS manual and the Fast Tek QMS manual. The only difference between the two documents was the company name in the introduction. Otherwise the documents were identical.

After a five-day preliminary injunction hearing, the trial court granted Product Action's preliminary injunction request. One finding in the order was that Fast Tek and AGS are alter egos of one another, making AGS liable for the actions of Fast Tek. In part the trial court held that the Defendants willfully and maliciously violated the Indiana Uniform Trade Secrets Act, which entitled Product Action to injunctive relief. The trial court also concluded that Product Action also met its burden to show by the preponderance of the evidence, that the Defendants violated Indiana's civil RICO statute, which also provides for injunctive relief.

The order of the preliminary injunction read as follows:

It is, therefore, ORDERED, that defendants Fast Tek Group, LLC, Chan Chanthaphone, AGS Capital, LLC, Alan G. Symons, Scott Weaver, and Anthony Roark, their officers, agents, servants, employees, and attorneys, and those

persons in active concert or participation with them, including officers, agents, servants, employees, and attorneys of Superior Metal Technologies, LLC, Sam's Technical Publishing, SMT Transportation, Point 2 Point, and Desk Port Technologies, are preliminarily enjoined from the following:

1. Using in any way, information taken by Anthony Roark and Chan Chanthaphone from Product Action International, LLC or its predecessor, Product Action International, Inc.

2. Using in any way, information, methods, procedures, forms or documents, derived or originated from information taken by Anthony Roark and Chan Chanthaphone from Product Action International, LLC or its predecessor, Product Action International, Inc.

3. For a period of two years, in any way, directly or indirectly, contacting soliciting, or accepting new business from those entities listed on the attached Exhibit A.

It is further ORDERED that for a period of one year, Chan Chanthaphone, AGS Capital, LLC, Alan G. Symons, Scott Weaver, and Anthony Roark, their officers agents, servants, employees and attorneys, and those in active concert or participation with them, are preliminarily enjoined from in any way, directly or indirectly, participating in the business or operations of Fast Tek Group, LLC.

The Court further ORDERS the following affirmative acts of defendants Fast Tek Group, LLC, Chan Chanthaphone, AGS Capital, LLC, Alan G. Symons, Scott Weaver, and Anthony Roark, such acts being necessary to prevent future misuse of information illegally obtained from Product Action in violation of the Indiana Trade Secrets Act and RICO statute.

1. This Court appoints Rebecca Hendricks as its designated expert, to be responsible for expunging from the computer systems of Fast Tek Group, LLC and AGS Capital, LLC all electronic data taken by Chan Chanthaphone and Anthony Roark from Product Action, and all information, methods, processes, forms, or documents derived or originated from such information taken by Chanthaphone and Roark from Product Action, which expungement shall be conducted expeditiously in accordance with the following procedures:

a. Defendants shall pay all costs relating to expunging of electronic data from the computer systems of Fast Tek and AGS. Within ten days of this Order, defendants are ordered to pay $25,000 to the Clerk of Marion County Superior Court to cover the expected costs of expungement. Ms. Hendricks shall submit invoices to this Court for her work on the 15th and last day of each month in which her work is performed. These invoices shall be approved by the Court and before submission to the Clerk for payment.

b. Ms. Hendricks shall prepare and submit to the Court a proposed protocol specifying the methodology she intends to use to expunge the information. Once approved by this Court, Ms. Hendricks shall make arrangements with Fast Tek and AGS to execute the protocol. Before any data are removed, Ms. Hendricks shall provide a list to the Court and counsel of the information she proposes to expunge and counsel for defendants shall have seven days to object to the expungement of any information

listed. Counsel for plaintiff shall have five days to respond to defendants' objections. The Court will either rule based on submissions or set the matter for hearing.

c. Upon the completion of the computer data expungement, Ms. Hendricks shall submit a report to the Court summarizing her work and the results thereof with a copy to counsel for the parties.

2. Fast Tek and AGS shall, within ten days, return all documents and materials containing information obtained, derived, or originated from information taken by Chanthaphone and Roark from Product Action, and file a certification with the Court that all such documents have been returned.

The strength of plaintiff's case, including the admissions of theft and misuse by defendants, makes it likely that plaintiff will succeed on the merits. The Court also believes that defendants are unlikely to suffer significant losses as a result of being enjoined from misusing trade secrets. Therefore, plaintiff is ORDERED to post bond in the amount of $2,000.00 within ten (10) days.

Appellants' Appendix at 35–38.

After filing a notice of appeal, the Defendants requested the trial court to stay the enforcement of the preliminary injunction pending appeal, which was denied. The Defendants, now Appellants, filed with this Court a motion for an emergency stay of enforcement of the preliminary injunction. This Court denied the motion except as to the portion of the order prohibiting the defendants from participating in Fast Tek's business for one year and the portion requiring that certain electronic information be expunged from Fast Tek's and AGS's computer systems.

## Standard of Review

■ The issuance of a preliminary injunction is within the sound discretion of the trial court, and our review of such an order is limited to whether there has been a clear abuse of discretion. *U.S. Land Services, Inc. v. U.S. Surveyor, Inc.,* 826 N.E.2d 49, 62 (Ind.Ct.App.2005). When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. Ind. Trial Rule 52(A). When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. *Barlow v. Sipes,* 744 N.E.2d 1, 5 (Ind.Ct.App.2001), *trans. denied.* The trial court's judgment will be reversed only when clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Id.*

■ To obtain a preliminary injunction, the moving party has the burden of demonstrating by a preponderance of the evidence that:

(1) the movant's remedies at law were inadequate, causing irreparable harm pending resolution of the substantive action; (2) the movant had at least a reasonable likelihood of success at trial by establishing a *prima facie* case; (3) the threatened injury to the movant outweighed the potential harm to the defendant; and (4) the public interest would not be disserved.

*Ind. Fam. and Soc. Serv. Admin. v. Walgreen Co.,* 769 N.E.2d 158, 161 (Ind.2002). If the movant fails to prove any of these requirements, the trial court's grant of a preliminary injunction is an abuse of discretion. *Id.* The power to issue a prelimi-

nary injunction should be used sparingly, and such power should not be used except in rare instances in which the law and facts are clearly within the moving party's favor. *Planned Parenthood of Ind. v. Carter*, 854 N.E.2d 853, 863 (Ind.Ct.App.2006).

## Discussion and Decision

### I. Preemption of RICO by IUTSA[2]

First, the Appellants contend that the Indiana Uniform Trade Secrets Act ("IUT-SA") preempts Product Action's claims under Indiana's Racketeer Influenced and Corrupt Organizations ("RICO") statute. IUTSA is the statutory scheme that protects trade secrets from inappropriate disclosure, because "[u]nlike other assets, the value of a trade secret hinges on its secrecy." *Bridgestone Americas Holding, Inc. v. Mayberry*, 878 N.E.2d 189, 192 (Ind. 2007). At the beginning of IUTSA, the act sets forth that it "displaces all conflicting law of this state pertaining to the misappropriation[3] of trade secrets, except contract law and criminal law." Ind.Code § 24–2–3–1(c) (herein, "preemption provision"). By this language, the Appellants urge that the trial court erred in awarding preliminary injunctive relief under RICO, because it would be law displaced by IUT-SA.

The issue is one of first impression in Indiana. In fact, there is little Indiana case law on the application and scope of the IUTSA preemption provision. In *Infinity Products, Inc. v. Quandt*, our Supreme Court held that the common law doctrine of respondeat superior conflicted with IUTSA's proof requirement that a defendant knows or has reason to know that the trade secret at issue was acquired by improper means. *Infinity Products, Inc. v. Quandt*, 810 N.E.2d 1028, 1034 (Ind.2004). In beginning its analysis, the majority turned to the language of the statute to discern the intent of the legislature for guidance:

Indiana's statute is based on the Uniform Trade Secrets Act and we are one of some forty states that have adopted it. The legislature announced its purpose in adopting the uniform act and provided some guidance on its general construction: "This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject matter of this chapter among states enacting the provisions of this chapter." Ind.Code Ann.

---

**2.** The Appellants contend that IUTSA preempts "all counts of the Complaint asserting something *other* than a trade secrets claim." Appellants' Br. at 27. However, these other claims are not the basis of the preliminary injunction, so the issue of whether they are preempted by IUTSA is not properly before us.

**3.** IUTSA defines "misappropriation" as the:
(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) disclosure or use of a trade secret of another without express or implied consent by a person who:
 (A) used improper means to acquire knowledge of the trade secret;

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
 (i) derived from or through a person who had utilized improper means to acquire it;
 (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
 (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
 (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
Ind.Code § 24–2–3–2.

§ 24–2–3–1(b) (West 1995). The General Assembly has also told us: "The chapter displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, except contract and criminal law." Ind.Code Ann. § 24–2–3–1(c). Our legislature's statement about displacement of conflicting law is somewhat stronger than the one contained in the uniform act as it existed at the time the General Assembly acted. And the commentary to the uniform act made plain then, as it does now, that the act was designed to cover "duties imposed by law," as opposed to duties that arise from agreements, for example. Illinois courts, following similar provisions in that state's law, have held that common law remedies are supplanted by the act. *See, e.g., Pope v. Alberto–Culver Co.,* 296 Ill.App.3d 512, 230 Ill.Dec. 646, 694 N.E.2d 615 (1998); *AutoMed Technologies, Inc. v. Eller,* 160 F.Supp.2d 915 (N.D.Ill.2001).

*Id.* at 1033. While the Court's analysis involved the doctrine of respondeat superior, it also acknowledged Infinity's argument relying on the criminal conversion statute in a footnote. *Id.* n. 4. It concluded that the defendant did not possess either of the required levels of knowledge for either conversion or trade secret misappropriation. *Id.* However, the Court generally noted: "While the uniform act declares that it does not displace criminal law, Ind.Code § 24–2–3–1, we leave open the question whether civil provisions for treble damages based on certain criminal acts is covered by this declaration." *Id.*

This is the exact question presented here. RICO's civil remedy of treble damages is premised on the petitioner being the victim of the defendant's pattern of criminal activity. *See* Ind.Code § 34–24–2–6(b). To answer this question, we look to the adoption and application of the Uniform Trade Secrets Act by Indiana and other states.

In 1982, Indiana was one of the first states to adopt the Uniform Trade Secrets Act ("UTSA") substantially as promulgated by the National Conference of Commissioners on Uniform State Laws. *Amoco Prod. Co. v. Laird,* 622 N.E.2d 912, 917 (Ind.1993). As noted above, Indiana's preemption provision contains stronger language than the UTSA.[4] The UTSA preemption provision is as follows:

SECTION 7. EFFECT ON OTHER LAW.

(a) Except as provided in subsection (b), this [Act] displaces conflicting tort, restitutionary, and other law of this State providing civil remedies [5] for misappropriation of a trade secret.

(b) This [Act] does not affect:

(1) contractual remedies, whether or not based upon misappropriation of a trade secret;

(2) other civil remedies that are not based upon misappropriation of a trade secret; or

(3) criminal remedies, whether or not based upon misappropriation of a trade secret.

*Id.* The overwhelming majority of states adopting UTSA did so utilizing the 1985

---

**4.** The UTSA was amended in 1985 to "clarif[y] the intent of the 1979 Official Text." Unif. Trade Secrets Act, 14 U.L.A. 463 (1990). Indiana enacted its version of the UTSA prior to the 1985 amendments. However, the changes to the preemption provision of the UTSA were relatively minor. Thus, Indiana's preemption provision *still contains stronger*

language than that of the 1985 version of the UTSA.

**5.** The 1979 UTSA version used the term liability instead of remedy. http://www.law.upenn. edu/bll/ archives/ulc/fnact99/1980s/utsa85.htm (last visited March 6, 2008). However, this *does not alter our analysis.*

version.[6] http://www.nccusl.org/Update /un-
iformact—factsheets/uniformacts-fs-utsa.
asp (last visited March 6, 2008). Our Gen-
eral Assembly declared that in adopting
the UTSA that it "shall be applied and
construed to effectuate its general purpose
to make uniform law with respect to the
subject matter ... among states enacting
the provisions." Ind.Code § 24-2-3-1.
While our Supreme Court noted the dis-
tinction between the UTSA and IUTSA in
that the IUTSA preemption provision is
greater in scope based on its language,
another linguistic distinction between the
two acts must also be recognized.

While the version of the UTSA preemp-
tion provision reads that it "displaces con-
flicting tort, restitutionary, and other law
of this State providing civil *remedies,*"
IUTSA's provision "displaces all conflicting
law of this state pertaining to the misap-
propriation of trade secrets, except con-
tract law and criminal law." (Emphases
added). Rather than dealing in terms of
the remedies provided, IUTSA refers to
areas of the law as a whole. Thus, exempt
from this IUTSA provision is the criminal
law and its concomitant criminal remedies.
With this in mind, we examine the nature
of an Indiana RICO action.

The fundamental element required in
pursuing a RICO action is the demonstra-
tion that the defendant committed two
predicate acts. *See* Ind.Code §§ 34-24-2-
6; 35-45-6-1; 35-45-6-2. These predi-
cate acts consist of various types of crimi-
nal activity, and include the receipt of sto-
len property, an allegation raised herein.
*See* I.C. § 35-45-6-1(e) ("Racketeering ac-
tivity"). Moreover, not only are these un-
derlying predicate offenses based on crimi-
nal law, but also the commission of two or
more offenses can constitute a pattern of
racketeering that subjects the perpetrator

to the possibility of additional criminal
charges. *See* I.C. § 35-45-6-2 (Corrupt
Business Influence, a Class C felony). In
addition to the criminal law sanctions for
such activities, our General Assembly also
provided for a private right of action
against such corrupt business influences.
I.C. § 34-24-2-6. This provision provides
a civil remedy for this type of criminal
activity, creating an additional disincentive
for would be criminals.

All of these sanctions have a common
goal. They were enacted to provide two
fronts and a field of landmines to deter
and ultimately eliminate egregious and
schematic criminal activity affecting the
citizens of our state.

■ Because the RICO statute was de-
signed to address the more sinister forms
of corruption and criminal activity, the
preemption provision of IUTSA should not
prohibit RICO from fulfilling its purpose
where the form of corruption involves the
systematic acquisition of economically
valuable information through the artifice of
competitors' employees in order to gain an
unlawful economic advantage in the mar-
ketplace. RICO is structured to reach and
punish these diabolical operations that are
a greater threat to society than random
theft. In consideration of the purpose and
goals of the entire RICO framework, we
conclude that the civil remedy portion pro-
viding for a private action is a derivative of
the criminal law. Thus, this type of action
is not preempted by IUTSA.

Moreover, we believe this conclusion will
result in a greater disincentive for the
commission of the strategic, repetitious
theft of trade secrets. Under IUTSA, a
basic claim only entitles a plaintiff to dam-
ages of their actual losses and any prova-
ble unjust enrichment. I.C. § 24-2-3-

**6.** Only Arkansas, California, Connecticut,
Indiana, Louisiana, Rhode Island, and Wash-

ington adopted some version of the 1979
UTSA.

4(a).[7] "If willful and malicious misappropriation exists, the court *may* award exemplary damages in an amount not exceeding twice any award made under subsection (a) [actual loss and unjust enrichment]." I.C. § 24–2–3–4(c) (emphasis added). Attorney's fees *may* be awarded to the prevailing party if willful and malicious misappropriation exists. I.C. § 24–2–3–5(3) (emphasis added). Under the civil RICO provision, "[u]pon a showing by a preponderance of the evidence that the aggrieved person has been damaged by corrupt business influence, the court *shall* order the person causing the damage ... to pay the aggrieved person: (1) an amount equal to three (3) times the person's actual damages; (2) the costs of the action; (3) a reasonable attorney's fees; and (4) any punitive damages awarded by the court and allowable under law." I.C. § 34–24–2–6(b) (emphasis added).

If IUTSA does preempt a civil RICO claim, a defendant seeking to decrease his potential payout would be inclined to make an admission or raise an affirmative defense to a RICO action that the information taken was a trade secret, thus limiting the plaintiff's action and recovery to the provisions of IUTSA. Furthermore, this would place a higher burden of proof on the plaintiff as to the amount of damages recoverable for harm inflicted by the theft of their ingenuity as required by the willful and malicious standard of IUTSA. Instead, we believe that permitting a RICO claim along with an IUTSA claim appropriately places a disincentive of a sizable magnitude to potential offenders, thereby providing greater protection for the integrity of Indiana businesses. Furthermore, by allowing both claims to proceed, the plaintiff is not forced to elect remedies

only to later be told that the items sought to be protected are not the type of trade secrets safeguarded under the act. "The future of the nation depends in no small part on the efficiency of industry, and the efficiency of industry depends in no small party on the protection of intellectual property." *Rockwell Graphic Systems, Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir.1991).

## II. Trade Secrets

■ Next, the Appellants argue that the trial court clearly erred in concluding that Product Action established a *prima facie* case of trade secret misappropriation based on IUTSA. First, the Appellants claim that Product Action International, LLC, did not demonstrate that it was the successor in rights to the trade secrets of Product Action International, Inc. Because Roark took materials prior to the reorganization of the corporation into an LLC, the Appellants essentially argue that Product Action, LLC, does not have a protectable trade secret interest in the information taken by Roark. However, the Appellants did not present this argument to the trial court and now raise it for the first time on appeal. Therefore, they have waived appellate review of the issue. *Hlinko v. Marlow*, 864 N.E.2d 351, 355 (Ind.Ct.App. 2007), *trans. denied.* Waiver notwithstanding, the evidence in the light most favorable to the ruling supports the trial court's finding that Product Action, LLC, is the successor of Product Action, Inc. The president and CEO of Product Action testified that when the restructuring of the company took place that there were no operational changes and that all rights of the corporation were transferred to the LLC. The Appellants did not present evidence to the contrary.

---

**7.** Short of establishing either, the court may order the payment of a reasonable royalty.

I.C. § 24–2–3–4(b).

No other challenge is raised against the overwhelming evidence of misappropriation of trade secret information that was brought to Fast Tek by Roark. Instead, the Appellants assert that the evidence does not support the finding of misappropriation of Product Action's trade secrets by AGS, Symons or Weaver when only taking into consideration the information taken by Chan. This argument is misguided. The findings regarding violations of IUTSA by AGS, Symons, and Weaver are also based on the trade secret information taken and disseminated by Roark.[8] The Appellants do not challenge these findings or that they support the trial court's conclusions. These findings clearly support the trial court's conclusion that Product Action established a *prima facie* case of trade secret misappropriation.

### III. RICO

■ Next, the Appellants argue that the trial court utilized the incorrect legal standard for awarding a preliminary injunction based on violations of RICO. We agree. Under Indiana's RICO statute, "the court may order a temporary order or a preliminary injunction, but only after a showing of immediate danger of significant loss or damage to the aggrieved person." Ind.Code § 34–24–2–6(a). Here, the trial court based the preliminary injunction for the RICO violations on the finding that Product Action "has been damaged by defendants' corrupt business influence[.]" This is the incorrect standard in granting a RICO-based preliminary injunction. A judgment is clearly erroneous if it relies on an incorrect legal standard. *Gabriel v. Windsor, Inc.*, 843 N.E.2d 29, 44 (Ind.Ct. App.2006). However, a reviewing court may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind. 1998). We conclude that the findings support the trial court's ultimate conclusion when applied to the correct standard for a preliminary injunction under RICO.

■ The information taken by Roark from Product Action and provided to Fast Tek had substantial commercial, competitive and economic value. Once disseminated to other Fast Tek employees, the stolen information was utilized in Fast Tek's daily operations. The sales and marketing material taken by Chan included restricted access customer requirements, sales presentations, and a confidential weekly management report. Some of this information was uniquely developed through customer interaction and institutional knowledge, giving it competitive and economic value. Chan began disseminating this information

---

**8.** The relevant findings are:

> 15. Throughout his employment with Fast Tek, Roark disseminated Product Action's trade secret information to other employees of Fast Tek, and this information was regularly used in Fast Tek's operations....
>
> . . .
>
> 17. Roark, working in concert with the management of Fast Tek and AGS, misappropriated, disseminated and misused Product Action's information with the intent to deprive Product Action of the value of that information.
>
> 18. Other management of Fast Tek, including Weaver and Phil Grove ("Grove"), Fast Tek's chief operating officer and later

> its vice president of strategic planning, and Cheri Smith, an AGS employee who served as Fast Tek's human resources director, knew this information had been taken from Product Action. Weaver, Smith and Grove actively encouraged and participated in the use of the information for Fast Tek's benefit.
>
> . . . .
>
> 31. Weaver knew in the summer of 2005 that Roark possessed confidential information taken from Product Action relating to its operational methods and processes and quality systems. Weaver actively encouraged the misuse of this information.

Appellants' App. at 22–23, 26.

on her very first day working for Fast Tek. The trial court also found that:

> "The conduct of defendants Fast Tek, AGS, Chanthaphone, Roark, Symons and Weaver has damaged Product Action's competitive advantage, deprived it of the full value of years of process development, experimentation, analysis, and continuous improvement, and threatens the continued growth of its business, its good will and its position as industry leader."

Appellants' App. at 31. The trial court also found that the potential harm to Product Action is substantial if the conduct of the defendants continued.

These findings illustrate that Fast Tek had possession of almost a blue print of their competitor's methods, processes, customer base, and marketing strategy. Such a treasure trove of business information in the hands of a company without the expense of developing the knowledge would put its competitor at a severe disadvantage. As noted by the trial court, the defendants' use of this stolen information threatened Product Action's continued growth as a business. We conclude that these findings support the conclusion that Product Action is in immediate danger of significant loss or damage if the defendants continued to use the stolen information. Therefore, the trial court did not abuse its discretion by imposing a preliminary injunction pursuant to RICO.

### IV. Alter Ego

The Appellants also challenge the trial court's finding that Fast Tek and AGS are alter egos of one another, holding AGS liable for the illegal actions of Fast Tek.[9] Specifically, the Appellants only challenge this component of the order on the basis that the trial court did not make a specific finding regarding the second prong of piercing the corporate veil analysis from *Escobedo v. BHM Health Assoc., Inc.*, 818 N.E.2d 930, 932 (Ind.2004).

■■■■■ Generally, Indiana courts are reluctant to disregard a corporate identity. *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 504 (Ind.Ct. App.2007). The doctrine of "piercing the corporate veil" can be used in certain circumstances to hold individuals or another corporation liable for the actions of a corporation. *See Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship*, 768 N.E.2d 463, 468 (Ind.Ct.App. 2002), *trans. denied; Smith v. McLeod Distrib., Inc.*, 744 N.E.2d 459, 462 (Ind.Ct. App.2000). "When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry; therefore, a trial court's decision to pierce the corporate veil will be accorded great deference." *Four Seasons Mfg., Inc.*, 870 N.E.2d at 504.

■■■■■ In *Escobedo*, our Supreme Court emphasized that "corporate law permits the corporate form to be disregarded and personal liability imposed only where (1) the corporate form is so ignored, controlled, or manipulated that it is merely the instrumentality of another, and (2) the misuse of the corporate form constitutes a

---

**9.** AGS also asserts that it was error for the trial court to even perform the alter ego analysis at the preliminary injunction stage because it is essentially the determination of the merits. However, the basis of a preliminary injunction requires a trial court to sift through the facts presented at a preliminary injunction hearing to determine whether the plaintiff has established a *prima facie* case in support of its burden to demonstrate a reasonable likelihood of success at trial. Although the trial court may have used more conclusory verbiage in its order, the trial court appropriately undertook the analysis to determine whether AGS should also be subject to the preliminary injunction based on a *prima facie* case warranting the piercing of the corporate veil.

fraud or promotes injustice." *Escobedo,* 818 N.E.2d at 935. The party seeking to pierce the corporate veil bears the burden of proof.

■ The Appellants argue that while "the trial court's determination that AGS has 'pervasive' involvement in Fast Tek . . . is a sufficient substitute for the first part of the *Escobedo* test," the trial court made no determination as to whether the misuse of the corporate form constitutes fraud or promotes injustice. Appellants' Br. at 49. We generally presume trial courts know and follow the applicable law. *Thurman v. State,* 793 N.E.2d 318, 321 (Ind.Ct.App.2003). Although the trial court's lengthy order does not include such a specific finding that the misuse of the corporate form, or as here the relevant business form of LLC, constitutes fraud or promotes injustice, findings of fact in the order support such a conclusion.

■ The relevant finding involves the incident where Weaver, 15% owner of AGS and then-president of Fast Tek, ordered his personal secretary to use the sister-company Superior Metal, owned and controlled by AGS, to pose as a potential customer to procure a price quotation from Product Action. This information was then provided to Fast Tek for its benefit to compete against Product Action. This manipulation through the use of the sister-companies owned and operated by AGS stabs at the very heart of healthy business competition. To permit this conglomeration of companies to operate in this manner supports the supposition that such circumstances promotes injustice by permitting unfair competition. We therefore conclude that the findings support the conclusion that AGS and Fast Tek are alter egos for the purposes of imposing a preliminary injunction.

### V. Irreparable Harm

■ Next, the Appellants assert that Product Action did not fulfill its burden to prove irreparable harm. To succeed on a request for a preliminary injunction, one of the four requirements that must be demonstrated by the petitioner is that its remedies at law are inadequate, causing irreparable harm, pending the full determination of the merits of the case. *Ind. Fam. and Soc. Serv. Admin.,* 769 N.E.2d at 161. A party that suffers mere economic injury is not entitled to injunctive relief because an award of post-trial damages is sufficient to make the party whole. *Barlow,* 744 N.E.2d at 6. The trial court has a duty to determine whether the legal remedy is as full and adequate as the equitable remedy. *Id.* A legal remedy is not adequate merely because it exists as an alternative to an equitable form of relief. *Id.* The equitable remedy of injunctive relief will be granted if it is more practicable, efficient, or adequate than that afforded by law. *Id.* at 6–7.

Here, Product Action was required to show irreparable harm to its business pending the determination of the merits of the case. However, this requirement does not mandate that the party demonstrate specific losses in its business. *Norlund v. Faust,* 675 N.E.2d 1142, 1149 (Ind.Ct.App. 1997), *trans. denied.* If a party seeking equitable relief could point to a specific dollar amount of losses, then a remedy at law would be sufficient. *Id.*

■ In its Findings of Fact, the trial court found that the conduct of the defendants "damaged Product Action's competitive advantage, deprived it of the full value of years of process development, experimentation, analysis, and continuous improvement, and threatens the continued growth of its business, its good will and its position as industry leader." Appellants' App. at 31. The trial court also concluded

that "[t]he conduct of the defendants has caused irreparable harm to Product Action for which it has no adequate remedy at law." *Id.* at 28. The evidence of the Appellants' egregious behavior in systematically stealing Product Action's proprietary methods, procedures and detailed customer and marketing information supports these findings for imposing a preliminary injunction.

Past opinions of this Court have concluded that the nature of the breach of a covenant not to compete may alone lead to the reasonable conclusion of irreparable harm to the plaintiff. *Norlund v. Faust* involved an optometrist breaching a covenant not to compete by leaving his employer and setting up a similar business in the same region. *Norlund,* 675 N.E.2d at 1146–1148. In its analysis of whether Faust had carried his burden to demonstrate irreparable harm, the court concluded that "[w]hen a covenant not to compete of this nature is breached, it follows that the employer will suffer harm. It would be pure speculation to place a dollar amount on the damages, and an injunction against the prohibited behavior is the most efficient way to lift the burden of that harm from the shoulders of the employer who contracted so as to not suffer such harm." *Id.* at 1149–1150. In *Welcome Wagon v. Haschert,* the court went so far as to state that "[i]n our opinion irreparable injury need not be shown where, as here, the services of the employee have been of such character that she gained knowledge of her employer's special and particular business methods and the very purpose of the breach is to capitalize upon the use of such methods for her own benefit." *Welcome Wagon v. Haschert,* 125 Ind.App. 503, 507, 127 N.E.2d 103, 106 (1955).

The blatant nature and means by which the Appellants raided Product Action's store of methods, processes, procedures, marketing information and customer lists permits the reasonable conclusion that Product Action is subject to irreparable harm from this conduct. According to the testimony of Grove, the business strategy of Fast Tek was to lure employees away from their competitors, such as Product Action, and acquire and utilize forms, documents, processes, and business models of its competitors. The success of this strategy was realized through the hiring of Roark and Chan, who brought the operational basics of Product Action to Fast Tek by way of materials stolen from Product Action. By their actions, Roark and Chan breached their confidentiality and noncompete agreements with Product Action.

We conclude that Product Action has and will suffer irreparable harm based on the actions of the Appellants and that an injunction against the use of this stolen information is the most efficient way to lift the burden of that harm from the shoulders of Product Action, who contracted with Roark and Chan so as to not suffer such harm.

### VI. Overbreadth of Preliminary Injunction

The Appellants present several arguments alleging that the scope of the preliminary injunction is too broad. Specifically, they challenge as overbroad the two-year restriction on contacting specified customers of Product Action, the one-year prohibition of participation by AGS, Symons and Weaver in the operations of Fast Tek, the removal of stolen information from Fast Tek's computer systems, and the award of attorney's fees. The Appellants also argue that the order fails to sufficiently define the information they are prohibited from using. We address each contention in turn.

 Preliminary and permanent injunctions serve different purposes, and,

therefore, may have different scopes. *U.S. Land Serv., Inc.,* 826 N.E.2d at 66–67. Preliminary injunctions are designed to protect the property and rights of the parties from any injury, usually by maintaining the status quo as it existed prior to the controversy, until the issues and equities in a case can be determined after a full examination and hearing. *Barlow,* 744 N.E.2d at 6. *See also U.S. Land Serv., Inc.,* 826 N.E.2d at 67. Such relief prevents harm to the moving party that could not be corrected by a final judgment. *Crossmann Cmty., Inc. v. Dean,* 767 N.E.2d 1035, 1042 (Ind.Ct.App.2002). For a preliminary injunction, the plaintiff need only show a *prima facie* case on the merits. *U.S. Land Serv., Inc.,* 826 N.E.2d at 67. The facts of the controversy are adjudicated in greater detail at the hearing for permanent injunction. *Id.* Injunctions must be narrowly tailored and never more extensive in scope than is reasonably necessary to protect the interests of the aggrieved parties. *Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 600 (Ind.2001).

### A. Solicitation of Customers

■ First, the Appellants contend that the portion of the preliminary injunction that states that the defendants are prohibited "[f]or a period of two years, in any way, directly or indirectly, contacting, soliciting, or accepting new business from those entities listed on the attached Exhibit A" is not sufficiently linked to the trade secret information that was allegedly taken. We disagree.

The evidence demonstrated that Roark came to Fast Tek with a library of trade secret information of Product Action's processes and methods that it had developed through trial and error over the lifetime of the company. Utilizing this information without the burden of expense and time of its development, Fast Tek gained a com-

petitive advantage in that it could offer the same quality of service as Product Action at a lower price. This information brought by Roark in combination with detailed, confidential customer and marketing information brought by Chan vastly enhanced Fast Tek's vantage point to sway customers away from Product Action. In fact, Chan admitted that she contacted companies that were customers of Product Action and that one of her selling points was that Fast Tek's prices were lower than those of Product Action. The list of companies compiled in Exhibit A is from the materials that Roark and Chan took from Product Action. Therefore, there is a sufficient link between the trade secret information taken and the prohibited conduct with specific customers contained in evidence. We conclude that this portion of the preliminary injunction is narrowly tailored in scope. *See U.S. Land Serv., Inc.,* 826 N.E.2d at 66 ("The Defendants should not be permitted to use [Plaintiff's] trade secrets to skip the trial and error phase to gain a competitive advantage.... We conclude that the trial court's preliminary injunction prohibiting Defendants from contacting surveyors listed ... is not overbroad on this basis.").

Although we do conclude that the scope of the customer contact portion of the order is proper, Appellants make a valid argument as to the effective timeframe of two years. As noted above, the purpose of a preliminary injunction is to prevent irreparable harm to a plaintiff pending the indeterminate amount of time needed to adjudicate the merits of the case. Thus, it is an inherent characteristic of a preliminary injunction order that it should not include a specific timeframe of its effectiveness. Rather, a preliminary injunction is effective until there is a final adjudication on the merits. On remand, the trial court is directed to revise its order accordingly.

### B. Participation In Fast Tek By AGS, Symons and Weaver

 Next, the Appellants challenge as overbroad the portion of the preliminary injunction that reads:

It is further ORDERED that for a period of one year, Chan Chanthaphone, AGS Capital, LLC, Alan G. Symons, Scott Weaver, and Anthony Roark, their officers[,] agents, servants, employees and attorneys, and those in active concert or participation with them, are preliminarily enjoined from in any way directly or indirectly, participating in the business or operations of Fast Tek Group, LLC.

Appellants' App. at 19. Fast Tek no longer employs Roark and Chan, so the Appellants only challenge this portion of the injunction as to Symons, Weaver and AGS. The Appellants assert that the order of the trial court makes this restriction "without authority or explanation." Appellants' Br. at 37.

 A preliminary injunction is to be narrowly tailored by the trial court to address the harm allegedly caused by the defendants. *Felsher*, 755 N.E.2d at 600. Furthermore, an injunction should not be so broad as to prevent the enjoined party from exercising his rights. *U.S. Land Serv., Inc.*, 826 N.E.2d at 65. The degree of restriction necessary is determinant upon the facts of the case. A preliminary injunction with a more expansive scope is warranted where the violations of the law and resulting harm are more outrageous. Because each case presents a unique set of circumstances, a trial court must have the power to tailor the equitable remedy of a preliminary injunction to best prevent further harm to the plaintiff.

The Appellants argue that there is no case law in which such a restraint on a sister-company, the chief executive officer of a company and the past president of a company had been imposed. This is presumably the basis for its conclusion that the trial court was without authority to impose such measure. What AGS fails to realize is that the conduct of the "next defendant" may be more atrocious than the last, mandating a preliminary injunction with a prodigious scope. The trial court had the authority to impose restrictions necessitated by the circumstances presented in this case. The question is whether this restriction is reasonably necessary to protect the interests of Product Action.

We believe that this provision would effectively shut down Fast Tek for a year. AGS is not only the sister-company of Fast Tek but is also the majority owner. Symons is the CEO of Fast Tek. Not only does the restriction apply to AGS, Symons and Weaver but it also restricts "their officers[,] agents, servants, employees and attorneys" from participating in Fast Tek. We cannot conceive how Fast Tek can operate in light of this provision of the preliminary injunction. It is the use and benefit from the continued application of processes and methods by Fast Tek that were systematically pirated from Product Action that poses harm to Product Action, not the existence and operation of Fast Tek in general. This provision prohibiting the participation of these particular actors goes far beyond what is reasonably necessary to protect Product Action's interests. The other provisions in the preliminary injunction that prohibit Fast Tek from "[u]sing in any way, information, methods, procedures, forms or documents, derived or originated from information" taken from Product Action, require the expungement of the electronic data from Fast Tek and AGS's computer systems, and require the return of the stolen documents and material adequately protect Product Action from the harm posed. We therefore

conclude that this provision prohibiting the participation of AGS, Symons and Weaver in the operation of Fast Tek is overbroad.

### C. Expunging Data From Fast Tek's Computer System

■ Third, the Appellants assert that the portion of the order requiring Fast Tek to expunge all electronic data taken by Roark and Chan, "and all information, methods, processes, forms, or documents derived or originated from such information taken by Chanthaphone and Roark from Product Action" denies Fast Tek the use of its own proprietary information. Appellants' App. at 36. Although there is the potential that some of the forms AGS and Fast Tek stole from Product Action and utilized in daily operation have important customer information, there are certainly computer processes available to preserve the customer information when the form itself is removed from the system. However, we also recognize that by their incorporation of these stolen documents into their daily operations, AGS/Fast Tek has created this potential problem and can now hardly be heard to complain that they will suffer as justice is dispensed to the business from which they stole. Nevertheless, the trial court incorporated a review of the protocol to be used to remove the data before the process would be implemented. This would permit AGS/Fast Tek to ensure none of their customer information would be lost.

### D. Attorney's Fees

The Appellants also argue that the trial court erred in awarding attorney's fees to Product Action under IUTSA at this point in the litigation. We agree.

■ Indiana follows the "American Rule" that requires each party to pay for his or her own attorney's fees absent an

agreement or statutory authority to the contrary. *Vasquez v. Phillips,* 843 N.E.2d 61, 64 (Ind.Ct.App.2006). Statutes in derogation of the common law should be strictly construed. *Id.*

■ IUTSA[10] provides that a court may order reasonable attorney's fees to the prevailing party of such actions. Generally, in order to be considered a prevailing party, plaintiffs must prevail on the merits of their claims. *See Kentucky v. Graham,* 473 U.S. 159, 164, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Plaintiffs may prevail by a judgment following a full trial of the merits or by consent decree or settlement that grants them the relief sought. *Young v. Indiana Dep't of Natural Res.,* 789 N.E.2d 550, 560 (Ind.Ct.App.2003), *trans. denied.* Neither situation is present here. Inherent in the definition of preliminary judgment is the fact that a judgment on the merits has yet to be made. So here, there is no judgment or settlement among the parties. Rather, the parties are still in the middle of litigating this case. Thus, the prevailing party is yet to be determined. As such, the trial court erred in awarding Product Action attorney's fees at this time.

### E. Prohibited Use of Information

■ Fifth, the Appellants contend that the portion of the order prohibiting them from using any information taken by Roark or Chan and any information, methods, procedures, forms or documents derived or originated from the stolen information is overbroad and lacks the necessary specificity for them to comply with the order. Indiana Trial Rule 65(D) requires every order granting a preliminary injunction to "describe in reasonable detail and not by reference to the complaint or

---

**10.** Ind.Code § 24–2–3–5(3).

other document, the act or acts sought to be restrained."

In support of their contention, the Appellants cite the recent case *Patriot Homes, Inc. v. Forest River Housing, Inc.*, 512 F.3d 412 (7th Cir. Jan.10, 2008). In *Patriot Homes*, the Seventh Circuit held that the preliminary injunction enjoining the defendant from "[u]sing, copying, disclosing, converting, appropriating, retaining, selling, transferring, or otherwise exploiting Patriot's copyrights, confidential information, trade secrets, or computer files" was vague and unenforceable. *Id.* at 414–15. The Court based this on the order's string of verbs failing to detail what specific conduct was prohibited and the substance of the trade secret or confidential information. *Id.* at 415.

The facts before us are distinguishable from those in *Patriot Homes*. The order prohibits the Appellants from the following:

1. Using in any way, information taken by Anthony Roark and Chan Chanthaphone from Product Action International, LLC or its predecessor, Product Action International, Inc.

2. Using in any way, information, methods, procedures, forms or documents, derived or originated from information taken by Anthony Roark and Chan Chanthaphone from Product Action International, LLC or its predecessor, Product Action International, Inc.

Appellants' App. at 35–36.

Here, the trial court entered findings that the information taken by Roark and Chan were trade secrets. Numerous exhibits where admitted which cataloged the information taken from Product Action's computer systems. Additionally, evidence demonstrated that Fast Tek altered some of the documents so that they could be used in its daily business operations. The trial court's prohibition is directly tied to the information taken by Roark and Chan that was introduced at the hearing. The prohibition targets the possession of the information in its original or altered form as well as the utilization of the methods and processes contained in the documents. In contrast to *Patriot Homes*, the language of the preliminary injunction has the necessary detail of what is the restricted trade secret or confidential information and what forms and uses are prohibited. Under these facts and circumstances, the prohibition of the utilization of the stolen documents and the information therein is not vague or overbroad.

## VII. Injunction Bond

 Finally, the Appellants challenge the preliminary injunction bond of $2000 as unreasonably low. Indiana Trial Rule 65(C) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sums as the court deems proper." The purpose of such a bond is "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." T.R. 65(C). A trial court's decision to set a security bond is reviewed for an abuse of discretion. *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 95 (Ind.Ct.App.2001), *trans. denied.* The size of the bond should approximate the damage the enjoined party will suffer if it is found that the injunction was wrongfully entered. *Id.* When assessing the amount of security, the trial court should consider its own experience and knowledge in addition to the estimated damages offered by the parties. *Kennedy v. Kennedy*, 616 N.E.2d 39, 43 (Ind.Ct. App.1993), *trans. denied.*

 Here, the trial court set the injunction bond at $2000. The Appellants

contend that this is an insufficient amount but do not provide a basis upon which a more appropriate calculation can be made. They direct us to a portion of the record where the current president of Fast Tek testified that the company would not be able to meet its financial obligations if the company was required to cease operations for more than a week. However, the preliminary injunction does not order such relief. Without more, the Appellants have not carried their burden on appeal to demonstrate that the trial court abused its discretion in setting the amount of the security bond.[11]

## Conclusion

In sum, we hold that IUTSA does not preempt a civil RICO claim because such a claim is an additional punishment made available by our General Assembly for particular schematic violations of Indiana's criminal law. Product Action presented a *prima facie* case under IUTSA and RICO, supporting the trial court's imposition of a preliminary injunction. We also affirm the trial court's alter ego determination as to AGS and Fast Tek. While the majority of the terms of the preliminary injunction are not overbroad, the provision prohibiting the participation of AGS, Symons and Weaver in the operation of Fast Tek is overbroad. Accordingly, we reverse that particular provision of the preliminary injunction and affirm the remaining provisions. We reverse the award of attorney's fees to Product Action as the prevailing party has yet to be determined by a trial on the merits. Finally, the Appellants have not carried their burden to establish that the injunction bond is inadequate.

Affirmed in part, reversed in part, and remanded for further proceedings.

BAKER, C.J., concurs.

VAIDIK, J., concurs in part and dissents in part with opinion.

VAIDIK, Judge, concurring in part, dissenting in part.

I respectfully concur in part and dissent in part. I concur in large part with the majority's opinion, except in two respects. Specifically, I write to express my disagreement with the majority's conclusions regarding whether the duration of the preliminary injunction issued by the trial court is overbroad and whether the $2000 injunction bond is unreasonably low.

First, I dispute the majority's conclusion that the preliminary injunction's two-year duration is improper. The majority first concludes that the two-year time period for the injunction is reasonable, but then states that "it is an inherent characteristic of a preliminary injunction order that it should not include a specific timeframe of its effectiveness. Rather, a preliminary injunction is effective until there is a final adjudication on the merits." The majority then reasons that because the case may linger for more than two years, the two-year limitation on the injunction was improper. I disagree.

To be sure, a preliminary injunction must end by the time the case is resolved on its merits, but it may appropriately end beforehand. The scope of an injunction cannot be broader than is "reasonably necessary to protect the interests of [an] aggrieved part[y]." *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 600 (Ind.2001).

---

11. We also note that even if the Appellants were found to have been wrongfully enjoined and their expenses and costs exceeded $2000, they would still be able to pursue the shortage from Product Action. *See Nat'l Sanitary Sup-* *ply Co. v. Wright*, 644 N.E.2d 903, 905 (Ind. Ct.App.1994) (A wrongfully enjoined defendant's recovery is not limited to the amount of security provided for under T.R. 65(C)), *trans. denied.*

Reasonableness in a particular situation may very well dictate that a preliminary injunction should end before a dispute is resolved on its merits. For example, in a case involving the enforcement of a non-compete agreement, the agreement might limit activity by the defendant for a period of one year. In such a case, the trial court would be perfectly justified in issuing a preliminary injunction for one year even though the case may pend for longer. Likewise, other circumstances may exist that make it reasonable for the court to limit the duration of the order. To force the trial court to issue a preliminary injunction until such time as the dispute is resolved might be unreasonable in light of the circumstances of a particular case.

Here, the appellants' sole objection to the length of the order is that the two-year order is too. long. The appellee does not argue that the two-year order is unreasonably short. What the majority does is to take the appellants' argument that the order should be made shorter and, based on that argument, lengthen the order. I say that the order is lengthened because by the time this appeal is done and the case is set for trial on the merits at the trial court level, more than two years will have elapsed before there is a final disposition on the merits. Because no one argues that the injunction should be made longer and because nothing in the record convinces me of such, I cannot find that the length of the trial court's order is unreasonable.

I also disagree with the majority's conclusion that the $2000 injunction bond is not unreasonably low. As the majority notes, the purpose of a bond ordered upon the issuance of a preliminary injunction is "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Ind. Trial Rule 65(C). Further, "[t]he size of the bond should approximate the damage the enjoined party will suffer if it is found that the injunction was wrongfully entered." Slip op. at 37 (citing *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 95 (Ind.Ct. App.2001), *trans. denied*). The majority recognizes the appellants' claim that they would be unable to meet financial obligations if required to cease operations for even a week. Nonetheless, the majority concludes that this is irrelevant because it is not what was ordered by the preliminary injunction. However, as the majority recognizes earlier in its opinion, this is the *effect* of the preliminary injunction. Further, in light of the appellants' presentation of evidence that the preliminary injunction would "result in immediate harm to Fast Tek in the nature of lost revenues estimated at a minimum of $980,000.00," Appellants' App. p. 132, I believe that ordering this nominal $2000 bond was an abuse of discretion.

Therefore, I respectfully concur in part and dissent in part. I would affirm in part and remand for a new determination of an appropriate preliminary injunction bond.